UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JESSICA T. BADILLA, et al.,                          **REPORT, RECOMMENDATION
                                                      AND ORDER**
                    Plaintiffs,

v.                                                    12-CV-01066(A)(M)

NATIONAL AIR CARGO, INC., et al.,

                    Defendants.

_____

This action arises from the crash of National Airlines Flight 662 into a mountain

east of Kabul International Airport in Afghanistan on October 12, 2010, while *en route* from

Bagram Air Base.  Plaintiffs, the alleged personal representatives of six crew members killed in

the crash, commenced this removed action on October 2, 2012 by filing a Summons and

Complaint in State of New York Supreme Court, County of Erie [1-3],[1] asserting state law

negligence claims and seeking to recover unspecified damages.

This action has been referred to me by Hon. Richard J. Arcara for supervision of

pretrial proceedings, including the preparation of a Report and Recommendation on dispositive

motions [13].  Before me are plaintiffs' motion to remand [18, 24] and for leave to conduct

limited jurisdictional discovery in further support of their motion to remand [35], as well as

defendants Transafrik International Limited and Transafrik Corporation Limited's (collectively

"Transafrik") motion to dismiss the Complaint for, *inter alia*,  lack of personal jurisdiction [37].[2]

Oral argument was held on January 10, 2013 [40, 46].  For the following reasons,  plaintiffs'

_____

[1]        Bracketed references are to the CM/ECF docket entries.

[2]        After plaintiffs filed their motion to remand [18], they filed a supplement to that motion
[21] and then superseded this submission with an amended supplement [24].

motion for leave to conduct limited jurisdictional discovery [35] is granted in part and denied in part; and I further recommend that plaintiffs' motion to remand [18, 24] be denied, without prejudice to renewal following completion of limited jurisdictional discovery, and that defendants Transafrik's motion to dismiss [37] be denied, without prejudice to renewal if and when it is determined that subject matter jurisdiction exists.

## BACKGROUND

The Complaint alleges that defendants National Air Cargo, Inc., National Air Cargo Holdings, Inc., National Air Cargo Group, Inc., and/or National Air Cargo - Middle East FZE (collectively "National Air Cargo") "contracted to provide certain air transportation services in support of the mission of the North Atlantic Treaty Organization ('NATO') in Afghanistan". Complaint [1-3], ¶11. In connection with providing these services, National Air Cargo leased the aircraft that crashed from defendants Transafrik International Ltd. and/or Transafrik Corporation Ltd. Id., ¶14.[3] Defendant Midwest Air Traffic Control Service, Inc. ("Midwest ATC") provided air traffic control services for the airspace over Kabul International Airport and was providing these services to the aircraft at the time of the crash. Id., ¶¶30-31.

By Notice of Removal dated November 1, 2012, National Air Cargo removed this action pursuant to 28 U.S.C. §§1332 and 1441 "in that it [is] a civil action brought in a State Court by citizens of a foreign state against citizens of States of the United States, and the matter in controversy exceeds the sum of $75,000.00". Notice of Removal [1], ¶12. Midwest ATC

---

[3]    According to Transafrik International Ltd., Transafrik Corporation Ltd. was liquidated in approximately 1998 and has not been served in this action. Transafrik International Ltd.'s response to the Order to Show Cause [31], p. 2 of 5.

filed a Supplemental Notice of Removal [5] on November 11, 2012, alleging diversity jurisdiction and the existence of jurisdiction "pursuant to 28 U.S.C. §1442(a) as [it] was acting under an officer and/or agency of the United States at all times relevant to this action" and "the underlying accident occurred within a federal enclave where the United States exercised all power and authority". Id. ¶10. On December 18, 2012, Transafrik filed its consent [25] to National Air Cargo's Notice of Removal and Midwest ATC's Supplemental Notice of Removal.

Since I was concerned as to whether there was subject matter jurisdiction, on November 30, 2012, I issued an Order to Show Cause [17] directing the parties to show cause why the case should not be remanded. Later that same day, plaintiffs filed their motion to remand [18], and I issued a briefing schedule for that motion and my Order to Show Cause.

## ANALYSIS

A.    **Plaintiffs' Motion to Remand**

"Where . . . jurisdiction is asserted by a defendant in a removal petition, it follows that the defendant has the burden of establishing that removal is proper." United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994). See Flood v. CSX Transportation, Inc., 2012 WL 464189, *5 (W.D.N.Y. 2012) (Skrenty, J.) ("When a party files a motion to remand challenging the removal of an action from state court, the burden falls squarely upon the removing party to establish its right to a federal forum by competent proof"). "[I]f subject matter jurisdiction is contested, courts are permitted to look to materials outside the pleadings." Romano v. Kazacos, 609 F.3d 512, 520 (2d Cir. 2010).

Defendants removed this action alleging diversity, federal enclave, and federal officer jurisdiction.  I will address each form of alleged jurisdiction individually.

1.     **Diversity Jurisdiction**

It is alleged in the Complaint that each of the plaintiff decedents were residents of the Republic of the Phillipines at the time of the accident. Complaint [1-3], ¶8. In arguing that this action is brought "by citizens of a foreign state against citizens of States of the United States" (Notice of Removal [1], ¶12), National Air Cargo relies upon 28 U.S.C. §1332(c)(2), which states that "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same *State* as the decedent" (emphasis added).   As noted in my Order to Show Cause ([17], ¶1), §1332(e) defines "States" as "includ[ing] the Territories, the District of Columbia, and the Commonwealth of Puerto Rico".  Since foreign states such as the Philippines are not included in this definition,  I questioned whether plaintiffs could be considered foreign citizens.  Id.

Initially, it is not evident that "State" carries the same meaning as "States".  Even if it did, "[i]t would be absurdly inconsistent . . . to treat the representative of a citizen's estate according to the decedent's citizenship, but to treat the representative of an alien's estate according to the representative's own citizenship.  The most obvious and sensible meaning of §1332(c)(2), which was clearly intended by Congress, is that the representative of a decedent's estate is treated as having the citizenship of the decedent." Geler v. National Westminster Bank

USA, 763 F.Supp. 722, 726 (S.D.N.Y. 1991).[4]  Therefore, I conclude that plaintiffs' citizenships are controlled by the citizenships of the decedents.

Whereas the Notice of Removal alleges that all plaintiffs were citizens of a foreign state ([1], ¶12), National Air Cargo now points out that the Letters of Limited Administration attached to the Complaint for plaintiff decedent Eduardo Padura ([18-1], p. 31 of 32) establish that,  unlike the other plaintiff decedents, he was domiciled in Erie County, New York, rather than the Philippines.  Id.[5]  Plaintiffs respond by moving [34] for leave to substitute his erroneous Letters of Limited Administration, which are attached to the Complaint as Exhibit A ([1-3], ¶10)[6], with the corrected version issued by the Erie County Surrogate's Court reflecting that his domicile was the Philippines.  Since the original Petition for Letters of Limited Administration  reflect Padura's domicile as being the Phillipines [34-3] and there was no opposition to this motion at oral argument, I will deem plaintiffs' Complaint amended to reflect the corrected Letters of Limited Administration for decedent Padura.

--------

[4]      A number of courts have adopted this same reasoning. *See, e.g.*, Kato v. County of Westchester, 927 F.Supp. 714, 716 (S.D.N.Y.1996); Miller ex rel. Estate of Dimas v. Morocho Brother's Construction, Inc., 2004 WL 727040, *2 n.3  (M.D.N.C. 2004); Rick v. Women's and Children's Hospital, 2010 WL 2360703, *3 (W.D.La. 2010).

[5]      Relying on 28 U.S.C. §1332(a)(3), which provides for original jurisdiction of civil actions between "citizens of different States and in which citizens or subjects of a foreign state are additional parties", National Air Cargo argues that "the fact that there are aliens on both sides of the caption does not affect the jurisdictional inquiry" since "a New York citizen (Padura) is bringing suit against a Michigan citizen/corporation (NAC Group) and a Kansas citizen/corporation (Midwest)." National Air Cargo's Memorandum of Law [28], p. 5.

[6]      Although the Letters of Limited Administration are not attached to the copy of the Complaint [1-3] that accompanies that Removal Petition, they are attached to the copy of the Complaint accompanying plaintiffs' motion to remand [18-1].

With plaintiffs sharing foreign citizenship, National Air Cargo also corrects its allegation in the Notice of Removal ([1], ¶12) that defendants are "citizens of States of the United States", conceding that defendant National Air Cargo Middle East - FZE is an alien corporation, thereby "plac[ing] aliens on both sides of the caption [and] raising doubt as to the existence of federal jurisdiction under Section 1332(a)(2)." National Air Cargo's Memorandum of Law [28], p. 4. It is undisputed that Transafrik is likewise a foreign citizen. Transafrik's response to the Order to Show Cause [31], p. 2.

As I indicated in my Order to Show Cause ([17], ¶3), "[t]he general rule requiring complete diversity between opposing parties is explicit and unequivocal . . . . Clearly, this rule applies in cases where aliens appear on both sides of a case." International Shipping Co., S.A. v. Hydra Offshore, Inc., 875 F.2d 388, 391 (2d Cir.), cert. denied, 493 U.S. 1003 (1989). Therefore, I conclude that complete diversity is lacking.[7]

**2.    Federal Enclave Jurisdiction**

Midwest ATC's Supplemental Notice of Removal [5] alleges that "[t]he subject accident occurred, and the actions of employees of MIDWEST AIR were undertaken, within a federal enclave, that is, a place in which the United States has exclusive power and authority." Id., ¶16. "A federal enclave is 'a portion of land over which the United States government

---

[7]    Recognizing that even if the action is otherwise removable under 28 U.S.C. §1332(a), it "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought" 28 U.S.C. §1441(b)(2), National Cargo alleges in its removal petition that the New York defendants (National Air Cargo, Inc. and National Air Cargo Holdings, Inc.) were fraudulently joined. Notice of Removal [1], ¶13. However, since I have concluded that this case is not removable under §1332(a), I have not addressed this argument.

exercises *exclusive* federal jurisdiction.'" Tardd v. Brookhaven National Laboratory, 407 F.Supp.2d 404, 417 (E.D.N.Y. 2006) (emphasis added).

In support of Midwest ATC's argument that the actions of its employees were undertaken within a federal enclave, it alleges that Kabul International Airport "was owned by the Ministry of Transport and Civil Aviation . . . and operated by the [NATO International Security Assistance Force ('ISAF')], of which the United States is the principal participant". Von Campbell Affidavit [30-1], ¶11. Even accepting this as true, it fails to establish that the United States' jurisdiction over the Kabul International Airport was exclusive. Midwest ATC also fails to establish that the United States had exclusive control over the accident scene, which was approximately 25-30 kilometers east of the Kabul International Airport. [24-2], p. 29 of 31. Furthermore, it argues that "the United States Air Force was in control of the air space between the military base in Bagram and the Kabul International Airport" (Midwest ATC's Memorandum of Law [30], p. 15; Von Campbell Affidavit [30-1], ¶11), but cites no case law supporting that federal enclave jurisdiction can be established by control over airspace (as opposed to land).

In any event, "[t]he term 'federal enclave' originates in the enclave clause in the Constitution" Harris v. Kellogg, Brown & Root Services, Inc., 796 F.Supp.2d 642, 656 n.7 (W.D.Pa. 2011), which states that, "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places *purchased by the Consent of the Legislature of the State in which the Same shall be*, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings". U.S. Constitution Article I, §8, Clause 17 (emphasis added). Thus, even if

the United States exercised exclusive jurisdiction over the Kabul International Airport, the

accident scene, or airspace, "courts have reasoned that the enclave clause does not apply to a

military installation on foreign soil." Harris, 796 F.Supp.2d at 656 n.7 (citing cases). *See*

Gavrilovic v. Worldwide Language Resources, Inc., 441 F.Supp.2d 163, 176-77 (D.Me. 2006)

(rejecting federal enclave defense for alleged acts occurring at the Bagram Air Force base since

"the express language of the enclave clause . . . . speaks only of Congress's exclusive authority

over the District of Columbia, and over State land purchased by Congress with the consent of the

State Legislature in which the land is located"). Therefore, I conclude that federal enclave

jurisdiction is lacking.


### 3. Federal Officer Jurisdiction

The federal officer removal statute provides for removal when the case is brought

against "[t]he United States or any agency thereof or any officer (or any person acting under that

officer) of the United States or of any agency thereof, in an official or individual capacity, for or

relating to any act under color of such office". 28 U.S.C. §1442(a)(1). Although only Midwest

ATC has raised this as a ground for removal, plaintiffs agreed at oral argument that Midwest

ATC may unilaterally remove this entire action with all defendants under 28 U.S.C. §1442(a).

Transcript of the January 10, 2013 oral argument [46], p. 23. *See* Bradford v. Harding, 284 F.2d

307, 310 (2d Cir. 1960).

"Under the federal officer removal statute, suits against federal officers may be

removed despite the nonfederal cast of the complaint". Jefferson County, Alabama v. Acker,

527 U.S. 423, 431 (1999). Where, as here, the defendant is not a federal officer, three elements

must be satisfied for removal. "First, they must show that they are persons within the meaning of the statute who acted under a federal officer. Second, they must show that they performed the actions for which they are being sued under color of federal office. Third, they must raise a colorable federal defense." Isaacson v. Dow Chemical Co., 517 F.3d 129, 135 (2d Cir. 2008) (internal quotations and citations omitted). "The federal officer removal statute is not 'narrow' or 'limited.'. . . Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of §1442(a)(1)." Willingham v. Morgan, 395 U.S. 402, 406-07 (1969).

a.     **"Acting Under a Federal Officer" and "Under Color of Federal Office"**

There is no dispute that Midwest ATC is a "person" within the meaning of the statute. Transcript of the January 10, 2013 oral argument [46], p. 19. To satisfy the balance of the first element, "[d]efendants must [also] show that they were 'acting under' a federal officer." Isaacson, 517 F.3d at 136. This element is "to be interpreted broadly". Id. "[A]n entity 'act[s] under' a federal officer when it 'assist[s], or . . . help[s] carry out, the duties or tasks of the federal superior.'. . . In other words, there must exist a 'special relationship' between the two . . . . For example, close supervision of the private entity by the Government would constitute such a special relationship". Id. at 137 (quoting Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 152, 156 (2007)) (emphasis omitted).

The second element "requires Defendants to show that the acts complained

of . . . . were taken 'under color of [federal] office'" and "has come to be known as the causation requirement". Isaacson, 517 F.3d at 137. To satisfy this requirement, defendants "must demonstrate that the acts for which they are being sued . . . occurred *because* of what they were asked to do by the Government." Id. (emphasis in original). This hurdle also is "quite low". Id. "To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties . . . . [W]hether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer." Id. at 137-38 (emphasis in original).

The first and second elements "tend to collapse into a single requirement: that the acts that form the basis for the state civil . . . suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. Critical under the statute is to what extent defendants acted under federal direction at the time they were engaged in the conduct now being sued upon. Removal will not be proper where a private party establishes only that the acts complained of were performed under the *general* auspices of a federal officer." In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, 488 F.3d 112, 125 (2d Cir. 2007) (emphasis added). *See* Albrecht v. A.O. Smith Water Products, 2011 WL 5109532, *5 (S.D.N.Y. 2011) ("The acting under and causal connection prongs of § 1442 are closely related to one another").

The Complaint [1-3] alleges that Midwest ATC:

"(a) Negligently and carelessly gave instruction to National Airlines Flight

662 to execute an approach downwind for runway 29 at Kabul International
Airport and to maintain visual separation from a preceding aircraft at a time when
it knew or should have know such instruction was unsafe and dangerous; and/or

(b) Negligently and carelessly failed to provide National Airlines Flight 662
with a warning it was below the minium safe altitude for the area in which
it was operating; and/or

(c) Negligently and carelessly failed to provide necessary instruction to keep a
safe and proper separation between National Airlines Flight 662 and the
surrounding terrain; and/or

(d) otherwise negligently and carelessly failed to provide proper and safe
instructions, warnings, and/or other air traffic control services to National Airlines
Flight 662." Id., ¶33.

It is undisputed that at the time of the accident, Midwest ATC was providing

services pursuant to a subcontract (RMS-S-10-033) with Readiness Management Support L.C.

("RMS"), dated February 4, 2010 ([48-1]) and that RMS was providing services pursuant to a

contract with the United States Navy Space and Naval Warfare Systems Center Atlantic, which

designated Midwest ATC as an approved subcontractor. [48-2], MATCSI 00002.

In arguing that it was acting under a federal officer and is being

sued for actions performed under color of federal office, Midwest ATC relies primarily on the

Affidavit of Parry Von Campbell [30-1], its Vice President of International Services, who states

that:

- - "Prior to Midwest ATC assuming air traffic control duties at [Kabul

International Airport], those duties had been performed by active duty United States military

personnel.  Upon Midwest ATC's assumption of its contractual duties, active duty United States

military personnel remained in direct control of Midwest ATC's actions." Id., ¶5.

- - "[A]ll Midwest ATC personnel performing duties at [Kabul International Airport] worked under the direct and detailed supervision of a United States Air Force officer, designated as the Senior Air Traffic Control Officer ('SATCO') who exercised complete authority and control over the air traffic control facility." Id., ¶6.

- - "Midwest ATC personnel took specific direction from the SATCO and the senior master sergeant." Id.

- - "Midwest ATC personnel where embedded with the United States military and performed duties formerly fulfilled by active duty personnel." Id., ¶8.

- - "The SATCO was on site at the [Kabul International Airport] air traffic control facility on a daily basis and made frequent, regular visits to the control tower. He directed that all Midwest ATC personnel working in the control tower reside on base, just like active duty US and NATO forces. He authored and approved the manuals used in the facility which set forth how the duties of the air traffic controllers were to be performed. He determined staffing levels, scheduling and rotations for the working shifts of the Midwest ATC personnel. He had exclusive control over the allocation of resources utilized at the facility." Id., ¶10.

At oral argument, Midwest ATC's counsel also placed great emphasis on the following section of the subcontract (transcript of the January 10, 2013 oral argument [46], p. 25):

> "All work performed by the contractor . . . shall be in accordance with applicable Federal Aviation Administration (FAA) or International Civil Aviation Organization (ICAO) standards, Air Force Instructions and Department of Defense (DoD) regulations as applicable . . . . It has been determined that *the service provided by the contractor is part of an 'essential contract service' - therefore contractor personnel are designated as mission essential personnel.*" [48-1], MATCSI 00121 (emphasis added).

12

Casting doubt on at least some of the representations contained in the Von Campbell Affidavit, plaintiffs submit the Local Operating Procedures for the Kabul Afghanistan International Airport effective January 25, 2010, which states that "RMS Personnel under the authority of [the Combined Forces Air Component Commander's] designated [Airspace Coordination Authority] provide radar Approach Control Service." [24-2], p. 9 of 31, ¶1.3.2. According to plaintiffs, the designated Airspace Coordination Authority under the Local Operating Procedures was the ISAF, not the SATCO. Plaintiffs' Amended Supplemental Motion for Remand [24-1], p. 4 (*citing* §1.3.1 of the Local Operating Procedures). The Local Operating Procedures also state that "ICAO rules are to be followed". [24-2], p. 18 of 31, ¶5.

Further casting doubt on whether Midwest ATC was working under the direct and detailed supervision of the SATCO, the subcontract also states that:

- - "There is no United States sponsor on the base; therefore, the Contractor is required to coordinate/request assistance from NATO/ISAF forces to accomplish various tasks required under this [Technical Direction Letter]" ([48-1], MATCSI 00121, ¶6), and that:

- - "Midwest ATC *will be solely responsible for performance of the Services* hereunder, including day-to-day operations and supervision of, and control over, its employees and agents and the employees of its agents and subcontractors". Id., MATCSI 00107-08, ¶12 (emphasis added).

Even Von Campbell's statement that Midwest ATC's personnel "reside[d] on base" ([30-1], ¶10) appears to contradict the subcontract which states that "Team RMS personnel will be housed in a secure compound known as GREEN VILLAGE, located approximately 1.4km from the Kabul International Airport". [48-1], MATCSI 00121, ¶6.

13

Faced with the conflicting submissions contained in the current record, I am unable to determine at this point whether Midwest ATC was acting under a federal officer and is being sued for actions performed under color of federal office.

### b.  "Colorable Federal Defense"

"Given that the removal statute more generally is 'not narrow or limited'  and that one of its purposes is 'to have such defenses litigated in the federal courts,' the federal defense requirement is satisfied in 'all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law.' . . . . To be 'colorable,' the defense need not be 'clearly sustainable,'  as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." Isaacson, 517 F.3d at 139 (*quoting* Willingham, 395 U.S. at 406-07). *See*  In re Crowley, 2012 WL 4038445, *3 (W.D.Mich.), recon. denied, 2012 WL 4464650 (W.D.Mich. 2012) ("While the Court is not allowed to determine the validity of these defenses at this stage, the colorable federal defense requirement does demand that the Court make a threshold determination of plausibility").   "The acting under and causal connection prongs of § 1442 . . . often turn on much of the same evidence as the colorable federal defense prong."  Albrecht, 2011 WL 5109532 at *5 (*citing* In re Methyl Tertiary Butyl Ether Products Liability Litigation, 488 F.3d at 124).

Midwest ATC alleges that it has the following  colorable federal defenses:  "(1) government contractor defense; (2) political question doctrine; (3) the Defense Production Act; (4)  combatant activities defense and (5) a claim arising in a foreign country." Midwest ATC's Response [30], p. 6.  None of these defenses were expressly asserted in Midwest ATC's

Supplemental Notice of Removal [5]. Moreover, as noted by plaintiffs, only the government contractor and combatant activities defenses were raised in Midwest ATC's Answer. Plaintiffs' Reply [33], p. 9. Therefore, I will analyze only these defenses. *See* Blahnik v. BASF Corp., 2006 WL 2850113, *3 (S.D.Tex. 2006) ("In their Notice of Removal, Defendants fail to identify a federal defense arising out of their official duties, as required to support removal . . . . Likewise, the state court documents do not show that any of the Defendants ever asserted federal defense arising out of their official duties in their answers or other pleadings . . . . Without any indication that they are entitled to raise the required federal defense, the Defendants cannot invoke federal officer jurisdiction").

## 1. Government Contractor Defense

"In Boyle v. United Technologies Corp., [487 U.S. 500 (1988)], the Supreme Court extended the immunity afforded to the federal government's discretionary functions under the Federal Tort Claims Act to government contractors, by allowing those contractors an affirmative defense to state law tort actions where a 'significant conflict' exists between the requirements of state law and the contractor's obligations to the federal government . . . . The affirmative defense applies only if the government exercised significant control over the relevant actions of the contractor." Densberger v. United Technologies Corp., 297 F.3d 66, 75 (2d Cir. 2002), cert. denied, 537 U.S. 1147 (2003). Whereas Boyle addressed liability for design defects in military equipment, the government contractor defense has been extended in certain circumstances to service contracts. *See* Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329, 1333-34 (11th Cir. 2003) (applying the government contractor defense to a service contract with

the government); <u>Guillory v. Ree's Contract Service, Inc.</u>, 872 F.Supp. 344, 346 (S.D.Miss. 1994) ("Though a number of courts have limited applicability of the government contractor defense of *Boyle* to military procurement contracts, . . . this court finds more persuasive the reasoning of those courts which have determined that the defense applies to all contractors, not just military contractors, and that it applies to performance contracts, not just procurement contracts" (citing cases)).

   While plaintiffs argue that the government contractor defense does not extend to subcontractors such as Midwest ATC (plaintiffs' Amended Supplemental Motion for Remand [24-1], p. 7 *citing* <u>Morgan v. Great Southern Dredging, Inc.</u>, 2012 WL 4564688, *6 (E.D.La. 2012) ("because Great Southern was not a government contractor itself, but merely a subcontractor to AWA, it does not have a 'colorable' federal contractor defense")), cases have recognized its applicability. *See*, *e.g.*, <u>LaForge v. ECC Operating Services</u>, 2010 WL 497657, *2 (E.D.La. 2010) ("Because the principles underlying the government contractor defense support extending the defense to government subcontractors, the Court finds that Newpark's status as a subcontractor does not preclude it from relying on government contractor immunity as an affirmative defense"); <u>Griffin v. JTSI, Inc.</u>, 2009 WL 8761211, *12 n. 35 (D.Hawai'i 2009) ("Subcontractors are afforded the same protections under the government contractor defense as prime contractors"); <u>Maguire v. Hughes Aircraft Corp.</u>, 725 F.Supp. 821, 825 (D.N.J. 1989), <u>aff'd</u> 912 F.2d 67 (3d. Cir.1990) ("The fact that MPB was a subcontractor and dealt with Allison, rather than directly with the government, is not sufficient to defeat MPB's motion. The same policies which support the defense for Allison are applicable to MPB. The government contractor defense can apply to subcontractors, as well as general contractors").

Even if the government contractor defense is applicable to these circumstances, Midwest must still establish that the government "exercised *significant* control over [its] relevant actions". Densberger, 297 F.3d at 75 (emphasis added). While I recognize that the government contractor defense need only be "colorable", I am unable to determine the "color" of this defense from the submissions before me concerning the level of control the government exercised over the actions of Midwest ATC.

## 2. Combatant Activities Defense

The Federal Tort Claims Act bars suits against the federal government for "[a]ny claim arising out of the combatant activities of the military . . . during time of war." 28 U.S.C. §2680(j). Relying on Boyle, supra, this immunity has been extended to contractors. Thus, "[d]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." Saleh v. Titan Corp., 580 F.3d 1, 9 (D.C. Cir. 2009). *See* Aiello v. Kellogg, Brown & Root Services, Inc., 751 F.Supp.2d 698, 714 (S.D.N.Y. 2011).

Plaintiffs argue that "[a]t the time of the accident . . . there was no authorized act of military force being directed at plaintiffs' decedents". Plaintiffs' Reply Memorandum of Law [33], p. 10. However, for this defense to apply, the claim need not arise from an act of military force *directed* at the plaintiff. *See* Aiello, 751 F.Supp.2d at 710 (rejecting limitation of the combatant activities defense to only suits brought by those against whom force is directed).

Nevertheless, from the record before me, I am unable to determine whether this is a colorable defense. Although Von Campbell's Affidavit [30-1], states "that the actions of Midwest ATC were directly related to combatant activities" (id., p. 4), it remains unclear whether the military "retained command authority" over these activities.

Although Midwest ATC has not conclusively established that this case was properly removed under the Federal Officer Removal statute, I conclude that remand is not warranted at this time. *See* Finkelstein v. Guardian Life Ins. Co. of America, 2007 WL 1345228, *4 n. 1 (N.D.Cal. 2007) (rejecting argument that remand was warranted where the defendants had not conclusively established that ERISA governed the action since federal courts are not required to "decide remand motions strictly on the basis of what is filed in the moving papers. Indeed, such an argument runs contrary to the common practice of permitting parties to engage in preliminary and limited discovery to resolve any factual disputes that may raise jurisdictional doubts"). As discussed below, I recommend that plaintiffs' motion to remand be denied, without prejudice to renewal following limited jurisdictional discovery.

**B.      Plaintiffs' Motion for Leave to Conduct Limited Jurisdictional Discovery**

Plaintiffs move to conduct discovery into National Cargo's fraudulent joinder arguments. Plaintiffs' Motion [35], ¶¶2-4. Since I have determined that diversity jurisdiction is lacking, this aspect of plaintiffs' motion is denied as moot.

Plaintiffs also move to depose Mr. Von Campbell with respect to the allegations contained in his Affidavit. Plaintiffs' Motion [35], ¶9. As discussed above, whether federal officer jurisdiction exists turns on the supervision and control the government exercised over

Midwest ATC's activities. Therefore, I agree that plaintiffs should have the opportunity to test the allegations set forth in Von Campbell's Affidavit [30-1] addressing federal officer jurisdiction. *See* <u>Battle v. Countrywide Home Loans, Inc.</u>, 2005 WL 2284250, \*2 (N.D.Ill. 2005) ("Defendants should not be allowed to side-step the key issue at hand by providing a bare-boned declaration with unverified information. Therefore, we deny Plaintiffs' motion to remand without prejudice and grant the parties leave to conduct limited discovery").

Where, as here, "pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary", jurisdictional discovery should be granted. <u>Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC</u>, 2006 WL 708470, \*6 (S.D.N.Y. 2006). *See* <u>In re MPF Holdings US LLC</u>, 701 F.3d 449, 457 (5th Cir. 2012) ("[W]hile a court should determine whether it has subject matter jurisdiction at the earliest possible stage in the proceedings, some jurisdictional discovery may be warranted if the issue of subject matter jurisdiction turns on a disputed fact"); <u>Laub v. United States Department of the Interior</u>, 342 F.3d 1080, 1093 (9th Cir. 2003) ("discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary"). This holds true where there are disputed factual issues on a motion to remand. *See* <u>Finkelstein</u>, 2007 WL 1345228 at \*4 n. 1; <u>Cousin v. Diabetes Management and Supplies</u>, 2013 WL 211072, \*1 (E.D.La. 2013) ("Plaintiffs filed the instant Motion seeking remand . . . . After holding a status conference to discuss the pending Motions, the Court directed the parties to conduct limited discovery on the jurisdictional issues"); <u>Preston v. Tenet Healthsystem Memorial Medical Center, Inc.</u>, 463 F.Supp.2d 583, 585-86 (E.D.La. 2006), <u>aff'd</u>, 485 F.3d 804 (5th Cir.

2007) (permitting limited discovery in response to motion to remand a case removed under, *inter alia*, the federal officer removal statute).

I recognize that if the disputed jurisdictional facts "are inextricably intertwined with the merits of the case [the court] should usually defer its jurisdictional decision until the merits are heard". Herbert v. National Academy of Sciences, 974 F.2d 192, 198 (D.C. Cir. 1992). While discovery into the level of control and supervision the government exercised over Midwest ATC will undoubtedly overlap to some degree with the merits of this case, I conclude that it is not inextricably intertwined with the merits so as to defer on this issue. Indeed, the only discovery requested by plaintiffs is a deposition of Mr. Von Campbell.

Therefore, plaintiffs' motion to conduct limited jurisdictional discovery is granted to the extent it seeks to depose Mr. Von Campbell concerning the representations contained in his Affidavit [30-1], but is otherwise denied. I recommend that plaintiffs' motion to remand be denied, without prejudice to renewal at the conclusion of this limited jurisdictional discovery.

## C.     Transafrik's Motion to Dismiss

Transafrik International Ltd. moves to dismiss the Complaint for lack of personal jurisdiction and for improper service and to dismiss defendant National Air Cargo Middle East FZE's cross-claims for lack of personal jurisdiction or, alternatively, for improper venue. Transafrik's Memorandum of Law [38], Points I, III, IV. Transafrik Corporation Ltd. also moves to dismiss the Complaint on the grounds that it is a dissolved entity. Id., Point II. To date, I have deferred setting a briefing schedule on Transafrik's motion. Following oral argument, Transafrik

submitted a letter brief [49] requesting that I "set a briefing schedule and rule on [their] motion to dismiss prior to resolution of the more complex remand issue". <u>Id</u>., p. 2.

I recognize that although "subject-matter jurisdiction necessarily precedes a ruling on the merits, the same principle does not dictate a sequencing of jurisdictional issues." <u>Ruhrgas AG v. Marathon Oil Co.</u>, 526 U.S. 574, 584 (1999). Thus, "[w]here . . . a district court has before it a straightforward personal jurisdiction issue presenting no complex question of state law, and the alleged defect in subject-matter jurisdiction raises a difficult and novel question, the court does not abuse its discretion by turning directly to personal jurisdiction." <u>Id</u>. at 588. However, "in most instances subject-matter jurisdiction will involve no arduous inquiry." <u>Id</u>. at 587.

Here, it does not appear that one jurisdictional issue is particularly more complex or straightforward than the other. Moreover, even if Transafrik's motion is successful, it would not render the subject matter jurisdiction challenge moot. Therefore, I conclude that there is no basis to depart from the general rule that challenges to subject matter jurisdiction be resolved before determining whether personal jurisdiction exists, and recommend that Transafrik's motion be denied, without prejudice to renewal, if and when it determined that subject matter jurisdiction exists.

**CONCLUSION**

For these reasons, plaintiffs' motion [35] for leave to conduct limited jurisdictional discovery is granted to the extent it seeks depose Mr. Von Campbell concerning the representations contained in his Affidavit [30-1], but is otherwise denied. I further recommend

that plaintiffs' motion to remand [18, 24] be denied, without prejudice to renewal following completion of Mr. Von Campbell's deposition, and that Transafrik's motion to dismiss [37] be denied, without prejudice to renewal, if and when it is determined that subject matter jurisdiction exists.

Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by October 17, 2013 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

DATED:   September 30, 2013

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge