UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JESSICA T. BADILLA, et al.,                                    **REPORT and**
                                                               **RECOMMENDATION**

                              Plaintiffs,

v.                                                             12-CV-01066(A)(M)

NATIONAL AIR CARGO, INC., et al.,

                              Defendants.
_____

   This action arises from the crash of National Airlines Flight 662 into a mountain

east of Kabul Afghanistan International Airport ("KAIA") on October 12, 2010, while *en route*

from Bagram Air Base.  Plaintiffs, the alleged personal representatives of six crew members

killed in the crash, commenced this removed action on October 2, 2012 by filing a Summons and

Complaint in State of New York Supreme Court, County of Erie [1-3],[1] asserting state law

negligence claims and seeking to recover unspecified damages.  This action was removed to this

court based upon diversity jurisdiction pursuant to 28 U.S.C. §§1332 and 1441 (National Air

Cargo defendants' Notice of Removal [1], ¶12), federal officer jurisdiction pursuant to 28 U.S.C.

§1442(a)(1) (Midwest Air Traffic Control Service, Inc.'s ("Midwest ATC") Supplemental Notice

of Removal [5], ¶11), and federal enclave jurisdiction (id. ¶16).  Thereafter, plaintiffs moved to

remand this action [18].

   By Report, Recommendation and Order dated September 30, 2013 [50], I

concluded that diversity and federal enclave jurisdiction were lacking, but I was unable to

_____

[1]   Bracketed references are to the CM/ECF docket entries.

determine from the record before me whether federal officer jurisdiction existed.  Therefore, I recommended denying plaintiff's motion to remand, without prejudice to renewal following the completion of jurisdictional discovery (id.).  Without any objections filed by the parties, my recommendation was adopted by Judge Arcara on October 21, 2013, and he referred the matter back to me for further proceedings [51].

The parties having completed their jurisdictional discovery, before me is plaintiffs' supplemental motion to remand [60]. Oral argument was held on April 24, 2014  [70]. For the following reasons, I recommend that plaintiffs' motion be denied.


## BACKGROUND

In opposing plaintiffs' initial motion to remand, Midwest ATC relied primarily on the Affidavit of Parry Von Campbell [30-1], its Vice President of International Services, to establish federal officer jurisdiction. September 30, 2013 Report, Recommendation and Order [50], pp. 11-12.  Since then, the parties have completed jurisdictional discovery, including the deposition of Von Campbell.  Midwest ATC's Opposition [68], p. 3.

 Von Campbell testified that Midwest ATC did not have a contract directly with the United States. Von Campell deposition transcript [60-4], pp. 7, 45. Instead, it was providing services at KAIA at the time of the accident pursuant to a subcontract with Readiness Management Support ("RMS"), the prime contractor, who had a contract with the United States military (id., pp. 44-45).

Von Campbell testified that Midwest ATC began providing radar approach services at KAIA in 2005, and in 2010 began providing control tower services, a role that was

previously filled by United States Air Force personnel and "some international controllers" (id.,

pp. 16-19).  He explained that as opposed to radar control, tower controllers provide control

service pursuant to visual flight rules (id., p. 18).

Midwest ATC began supplying these services pursuant to a Technical Direction

Letter Change Order ("Change Order") to its subcontract with RMS.  [64], Bates No.

MATCSI000384.  That Change Order, like the subcontract [65], stated:  "It has been determined

that the service provided by the contract is part of an 'essential contract service' - therefore

contractor personnel are designated as mission essential personnel".  [64], Bates No.

MATSCI000386.  The Change Order defines "essential contact service" as "[a] service . . . to

support vital systems including ships . . . operated in support of military missions or roles at sea

and associated support activities including . . . base support services considered of utmost

importance to the U.S. mobilization and wartime mission" (id., Bates No. MATSCI000398).

Von Campbell testified that after Midwest ATC transitioned to providing these

services in 2010,  the Senior Air Traffic Control Officer ("SATCO") "stayed on board and was

directly supervising [Midwest ATC] personnel".  Von Campbell deposition transcript [60-4],  p.

18.  During the time that Midwest ATC provided tower control services at KAIA, the SATCO

was always a United States military member (id., p. 40).

Von Campbell testified that at the time of the accident, the tower controller was

"following the procedures that were established by his supervisors" (id., pp. 28-29).  These

included Standard Operating Procedures ("SOPs"), which establish "rules and . . . guidelines for

the controller to follow" (id., pp. 53-54).  He also testified that the controller was following

guidance set forth in the Local Operating Procedures ("LOP")  (id., p. 54).  Although the Senior

Case 1:12-cv-01066-RJA-JJM   Document 71   Filed 10/23/14   Page 4 of 17

Master Sergeant or the SATCO were present at the control tower "very frequently, on a daily basis" (id., p. 78), the SATCO was not physically present in the tower at the time of the accident (id., p. 41).

In October 2010, tower control at KAIA had four positions:  local control, ground control, flight data or clearance delivery, and watch supervisor (id., p. 31).  Von Campbell testified that there were times when non-Midwest ATC personnel would man those positions (id.).  These included Afghan controllers, United State military controllers, and international civilian controllers (id., p. 34).  The SATCO was in charge of and drafted the training plan that permitted controllers to become certified (id., p. 33). The United States miliary provided initial training for the Midwest ATC controllers, and once Midwest ATC was able to staff the facility, Midwest ATC trained their own personnel, "but they were certified by either the SATCO or the deputy SATCO" (id., p. 36).

Pursuant to RMS's contract with the United States Navy [66], control tower watch supervision was among the duties to be performed by the contractor (id., MATCSI000160).  However, Von Campbell testified that even those Midwest ATC employees designated as Watch Supervisors "performed those duties under the direction from the SATCO and the Senior Master Sergeant". Von Campbell deposition transcript [60-4], p. 99.  When asked in what document the SATCO's supervision was memorialized, Von Campbell pointed to a September 6, 2010 e-mail from United States Air Force Captain Jeffrey W. Kipp, the SATCO, to Von Campbell and others, stating, in relevant part:

-4-

> "The one little intricacy that keeps rearing its head is 'Who is in charge of KAIA Tower?'  The controllers (MW/RMS) keep going to a single point of contact for any of their issues (Mr. Tim Dinnean [,Midwest ATC's Chief Controller]).  I have no problems with this if it is company related business, (time-sheets, personnel, administrivia, etc) however, when it is Operationally related ALL of those issues should be directly pointed at myself or SMSgt Stevenson . . . . REQUEST: Please advise all ATC tower controllers on the ground here at KAIA that . . . ALL operational issues WILL BE DIRECTED to/through myself or SMSgt Stevenson first" ([67], Bates No. MATCSI000475-76).  Von Campbell deposition transcript [60-4], pp. 58, 80-81.

Preceding this e-mail, Von Campbell had received a telephone call from Mr. Dinnean, advising him that he was no longer the Chief Controller as the SATCO had appointed Senior Master Sergeant Stevenson to serve in that role (id., p. 87).  Von Campbell testified the SATCO "dictated the policy" (id., pp. 97-98).

According to Von Campbell, KAIA was the only airport at which the SATCO took such an active role at the control tower level (id., p. 93).  He testified that this was "[b]ecause it was under the International Stabilization Forces Command", of which the United States military "is a main participant" (id., pp. 93-94).

The parties rely primarily on two documents governing operations at KAIA.  The LOP (version 9.8)  for KAIA[2] and SOP 202.   The LOP, which sets forth the hierarchy of command,  is signed by Ruben C. Garcia Servert of the Spanish Air Force, the Commander of KAIA [62], Bates No. MATCSI000440.  While the LOP provides that KAIA is owned by the Ministry of Transport and Civil Aviation of the Government of the Islamic Republic of Afghanistan, the Commander of KAIA, "under the command of [the Commander of the

---

[2]     This version was effective January 25, 2010, and neither party disputes that it was the operative LOP at the time of the accident. [62], Bates No. MATCSI000436.

International Security Assistance Force ("ISAF")], operates the military component of KAIA, assists the Afghan authorities in operating KAIA, and also assumes Air Traffic Control Authority". [62], Bates No. MATCSI000441, §1.1.  The LOP also sets forth various guidance concerning air operations, including that "[International Civil Aviation Organization ("ICAO")] rules are to be followed"  (id., Bates Nos. MATCSI000450-454, §5.  Of particular relevance, Midwest ATC notes that their "complaint against Midwest ATC relates directly to its controller's grant of priority to a civilian flight over Flight 662, which was a cargo flight" and that the LOP expressly addresses this issue by granting priority to civilian and military flights over cargo flights. [62], Bates No. MATCSI000450, §5.1.  *See* Midwest ATC's Opposition [68], p. 4.

Also governing operations at KAIA was SOP 202  ([63], Bates No. MATCSI000461-471), which implemented "guidance, responsibilities and procedures for Air Traffic Control . . . Service as a responsibility of ISAF at [KAIA]" (id., MATSCI000461, §1). Although the Commander of KAIA was "designated as the Senior Airfield Authority" and was "responsible for providing Air Traffic Control Service at KAIA", the KAIA "Chief of Air Traffic Control" was "empowered as the [SATCO] per applicable ICAO regulations" and was "the technical entity at KAIA concerning compliance with the Afghanistan [Aeronautical Information Publication ("AIP")], ICAO . . . and KAIA SOPs". [63], Bates No. MATCSI000462.

Significantly, Midwest ATC notes that SOP 202 provided guidance concerning the tasks and  responsibilities of the controllers, including passing "traffic to aircraft in the [control zone] . . . who's [*sic*] paths may conflict" (id., MATSCI000465,  ¶h), which is the "precise task at issue in this litigation".  Midwest ATC's Opposition [68], p. 5.  Additionally, SOP 202 references other documents, including the LOP.  [63], Bates No. MATCSI000461.   It

-6-

is also undisputed that SOP 202 was drafted by the SATCO, who the parties agreed at oral

argument was at all relevant times a United States officer (id.).[3]  SOP 202 was authorized by the

Commander of KAIA (id.).


# ANALYSIS

"Where . . . jurisdiction is asserted by a defendant in a removal petition, it follows

that the defendant has the burden of establishing that removal is proper."  United Food &

Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square,

Inc., 30 F.3d 298, 301 (2d Cir. 1994).

The federal officer removal statute provides for removal when the case is brought

against "[t]he United States or any agency thereof or any officer (or any person acting under that

officer) of the United States or of any agency thereof, in an official or individual capacity, for or

relating to any act under color of such office".  28 U.S.C. §1442(a)(1).[4]  Plaintiffs argue that

"[d]oubts concerning whether removal is proper [i]n a given case should be resolved in favor or

remand to the state court".  Plaintiffs' Supplemental Motion for Remand [60], p. 6. Generally,

"federal courts construe the removal statute narrowly, resolving any doubts against

removability".  Lupo v. Human Affairs International, Inc., 28 F.3d 269, 274 (2d Cir. 1994).

---

[3]         Although the version of SOP 202 which both parties rely upon was updated after the
accident on September 7, 2011 ([63], Bates No. MATCSI000461), the parties agreed at oral argument
that the pertinent provisions of this version of SOP 202 were in effect at the time of the accident.

[4]         Although only Midwest ATC has raised this as a ground for removal, plaintiffs agreed at
the January 10, 2013 oral argument on plaintiffs' initial motion to remand that Midwest ATC may
unilaterally remove this entire action with all defendants under 28 U.S.C. §1442(a).  Transcript of the
January 10, 2013 oral argument [46], p. 23.  See Bradford v. Harding, 284 F.2d 307, 310 (2d Cir. 1960).

However, the federal officer removal statute is  an exception to this rule.  *See* <u>Gordon v. Air &</u>
<u>Liquid Systems Corp.</u>, 990 F.Supp.2d 311, 316 (E.D.N.Y. 2014) (there is a "distinction between
the general removal statutes, which are to be strictly construed, and federal-officer removal,
which 'should not be frustrated by a narrow, grudging interpretation'"); <u>Albrecht v. A.O. Smith</u>
<u>Water Products</u>, 2011 WL 5109532, *3 (S.D.N.Y.), <u>recon.</u> <u>denied</u>, 2011 WL 6778471 (S.D.N.Y.
2011) ("[C]ourts must differentiate between removal under §1442 and removal under the general
removal statute, 28 U.S.C. §1441. When a party seeks to remove a case under §1441, removal is
disfavored unless the defendant establishes the court's jurisdiction under §1331 or §1332.
However, when a party seeks to remove a case under §1442, removal is favored in the interest of
public policy").  "The federal officer removal statute is not 'narrow' or 'limited.'. . . Congress
has decided that federal officers, and indeed the Federal Government itself, require the protection
of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of
§1442(a)(1)." <u>Willingham v. Morgan</u>, 395 U.S. 402, 406-07 (1969). *See* <u>Durham v. Lockheed</u>
<u>Martin Corp.</u>, 445 F.3d 1247, 1252 (9th Cir. 2006) (there is "a clear command from both
Congress and the Supreme Court that when federal officers and their agents are seeking a federal
forum, we are to interpret section 1442 broadly in favor of removal").

   "Under the federal officer removal statute, suits against federal officers may be
removed despite the nonfederal cast of the complaint". <u>Jefferson County, Alabama v. Acker</u>,
527 U.S. 423, 431 (1999).  Where, as here, the defendant is not a federal officer, three elements
must be satisfied for removal. "First, they must show that they are persons within the meaning of
the statute who acted under a federal officer.  Second, they must show that they performed the
actions for which they are being sued under color of federal office.  Third, they must raise a

-8-

colorable federal defense." Isaacson v. Dow Chemical Co., 517 F.3d 129, 135 (2d Cir. 2008)

(internal quotations and citations omitted).  The parties do not dispute that Midwest ATC is a

"person" within the meaning of the statute.  Transcript of the January 10, 2013 oral argument

[46], p. 19.  Therefore, my analysis will focus on the other elements.

A.      Acting "Under a Federal Officer" and "Under Color of Federal Office"

        The "acting under a federal officer"  element is "to be interpreted broadly".

Isaacson, 517 F.3d at 136.  "[A]n entity 'act[s] under' a federal officer when it 'assist[s], or . . .

help[s] carry out, the duties or tasks of the federal superior.'. . .  In other words, there must exist

a 'special relationship' between the two . . . . For example, close supervision of the private entity

by the Government would constitute such a special relationship".  Id. at 137 (quoting Watson v.

Philip Morris Companies, Inc., 551 U.S. 142, 152, 156 (2007)) (emphasis omitted).  See Gordon,

990 F.Supp.2d at 317 ("An entity acts under a federal officer when it helps with or carries out

that officer's duty, often under close supervision").

        "Although the words 'acting under' are to be liberally construed, they are not

limitless  . . . . . In order to establish that it is 'acting under' a federal officer, the private party

must do more than show that it complies with highly detailed federal regulations, or functions

under the extensive supervision or monitoring of the federal government . . . . Rather, it must

demonstrate that the assistance it provides to a federal officer goes beyond simple compliance

with the law and helps officers fulfill other basic governmental tasks." Veneruso v. Mount

Vernon Neighborhood Health Center, __ Fed. Appx. __, 2014 WL 1776011, *3 (2d Cir. 2014)

(Summary Order) (internal quotations and citations omitted).

The second element "requires Defendants to show that the acts complained of . . . . were taken 'under color of [federal] office'", and "has come to be known as the causation requirement". Isaacson, 517 F.3d at 137.  To satisfy this element, defendants  "must demonstrate that the acts for which they are being sued . . . occurred *because* of what they were asked to do by the Government." Id. (emphasis in original).  This hurdle also is "quite low". Id. "To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack  . . . occurred *while* Defendants were performing their official duties . . . .  [W]hether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal    not state    courts to answer." Id. at 137-38 (emphasis in original).

I must "credit Defendants' theory of the case when determining whether a causal connection exists." Id. at 137.  "This means that a removing party does not have to prove at the outset that the acts sued upon were actually taken under official authority.  Rather, that authority must simply be asserted at the removal stage." Kriss v. Bayrock Group LLC,  2014 WL 715660, *3 (S.D.N.Y. 2014).

The first and second elements "tend to collapse into a single requirement: that the acts that form the basis for the state civil . . . suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. Critical under the statute is to what extent defendants acted under federal direction at the time they were engaged in the conduct now being sued upon. Removal will not be proper where a private party establishes only that the acts complained of were performed under the *general* auspices of a federal officer."  In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation, 488 F.3d 112, 125 (2d Cir. 2007)

(emphasis added).  *See* <u>Albrecht v. A.O. Smith Water Products</u>, 2011 WL 5109532, *5 (S.D.N.Y. 2011) ("The acting under and causal connection prongs of §1442 are closely related to one another").

As plaintiffs recognize, "the main issue . . . is whether the employee of Midwest ATC who controlled National Airlines Flight 662 acted under the direction and control of a 'federal officer' at the time of the aircraft crash".  Plaintiffs' Reply [69], p. 2.  Supporting that Midwest ATC was not acting under the direction and control of a federal officer, Midwest ATC's subcontract with RMS provided that it "*will be solely responsible for performance of the Services* hereunder, including day-to-day operations and supervision of, and control over, its employees and agents and the employees of its agents and subcontractors".  [65], MATCSI00244-45, ¶12 (emphasis added).  However, notwithstanding the subcontract, Von Campbell's deposition testimony ([60-4], p. 18) establishes that in practice the SATCO directly supervised  Midwest ATC personnel.  The level of the SATCO's supervision is best demonstrated in Captain Kipp's e-mail to Von Campbell and other Midwest ATC personnel shortly before the accident in which he stressed - "Please advise all ATC tower controllers . . . ALL operational issues WILL BE DIRECTED to/through myself or SMSgt Stevenson first".  [67], Bates No. MATCSI000475-76.

Although the SATCO was not present in the tower providing instructions to Midwest ATC employees at the time of the accident, SOP 202, which was drafted by the SATCO, and the LOP, which was referenced in SOP 202, detailed the responsibilities of the air traffic controllers and provided guidelines for the performance of their duties, including the acts at issue in this action. Von Campbell deposition transcript [60-4], pp. 28-29, 53-54.  Midwest

ATC repeatedly argues that included in these instructions were *"*the precise task[s] at issue in this action" (Midwest ATC's Opposition [68], pp. 6, 8, 9).  Notwithstanding plaintiffs' argument that there is a lack of "nexus between the direction and control allegedly exercised by Captain Kipp over Midwest ATC employees and the crash of Flight[ ] 662" (plaintiffs' Reply [69], p. 6), for purposes of this motion, I must "credit Defendants' theory of the case when determining whether a causal connection exists."  Isaacson, 517 F.3d at 137.

In any event, even if the precise acts giving rise to plaintiffs' action against Midwest ATC were not part of the guidance set forth in the SOP and LOP, "[d]efendants must only establish that the act that is the subject of Plaintiffs' attack . . .  occurred *while* Defendants were performing their official duties".  Isaacson, 517 F.3d at 137-38 (emphasis addded). *See* Gordon, 990 F.Supp.2d at 318 ("Plaintiff argues . . . that defendants have not identified regulations or contract terms in which the Navy mandated the use of asbestos, but defendants may satisfy [the causation requirement] without reference to specific Navy requirements").

Plaintiffs further argue that Midwest ATC was not acting under the control of a federal officer since "SOP 202 . . . did not mandate or require that the position [of SATCO] be held [by] a member of the United States military" (plaintiffs' Reply [69], pp. 4-5); that the SATCO was not charged "with federal authority to promote or enforce the policies or regulations of the United States government or United States military" (id., p. 5); and that the "regulations and procedures adopted and promulgated by [the Afghanistan Ministry of Transport and Civil Aviation] and ISAF, rather than the United States military, directed and controlled how KAIA Tower Control was to be operated and how Midwest ATC employees were to control and direct

-12-

Flight 662" (id., p. 4).  None of these arguments, which plaintiffs fail to support with case law,
are availing.

"Cases in which the Supreme Court has approved removal involve defendants
working hand-in-hand with the federal government to achieve a task that furthers an end of the
federal government."  Ruppel v. CBS Corp., 701 F.3d 1176, 1181 (7th Cir. 2012). While the
federal government's work in Afghanistan was part of multinational effort, the United States was
still forwarding its own objectives as "a main participant" in the International Stabilization
Forces Command.  Von Campbell deposition transcript [60-4],  pp. 93-94.  Midwest ATC's
control tower services assisted the United States in achieving its objectives.  Indeed, these
services were identified in the Change Order as being an "essential contract service" , which was
defined as "[a] service . . . to support vital systems  . . . in support of military missions . . . and
associated support activities including  . . . base support services *considered of utmost
importance to the U.S. mobilization and wartime mission*".  " [64], Bates No. MATSCI000386,
398 (emphasis added).  Midwest ATC's personnel were also  "designated as mission essential
personnel" (id., Bates No. MATSCI000386).

Therefore, I conclude that Midwest ATC has satisfied the acting "under a federal
officer" and "under color of federal office" elements of the Isaacson test.


**B.    "Colorable Federal Defense"**

"Given that the removal statute more generally is 'not narrow or limited' and that
one of its purposes is 'to have such defenses litigated in the federal courts,' the federal defense
requirement is satisfied in 'all cases where federal officers can raise a colorable defense arising

-13-

out of their duty to enforce federal law.' . . . . To be 'colorable,' the defense need not be 'clearly

sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried

in federal court."  Isaacson, 517 F.3d at 139 (*quoting* Willingham, 395 U.S. at 406-07). *See*  In re

Crowley, 2012 WL 4038445, *3 (W.D.Mich.), recon. denied, 2012 WL 4464650 (W.D.Mich.

2012) ("While the Court is not allowed to determine the validity of these defenses at this stage,

the colorable federal defense requirement does demand that the Court make a threshold

determination of plausibility").  A "defendants' burden[ ] of persuasion and production are low".

Gordon, 990 F.Supp.2d at 318.

Plaintiffs' supplemental motion ignores this element of federal officer

jurisdiction. Nonetheless, "[w]hen a requirement goes to subject-matter jurisdiction, courts are

obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented".

Gonzalez v. Thaler, __ U.S.__,  132 S.Ct. 641, 648 (2012).


1.      **Government Contractor Defense**

"In Boyle v. United Technologies Corp., [487 U.S. 500 (1988)], the Supreme

Court extended the immunity afforded to the federal government's discretionary functions under

the Federal Tort Claims Act to government contractors, by allowing those contractors an

affirmative defense to state law tort actions where a 'significant conflict' exists between the

requirements of state law and the contractor's obligations to the federal government . . . . The

affirmative defense applies only if the government exercised significant control over the relevant

actions of the contractor." Densberger v. United Technologies Corp., 297 F.3d 66, 75 (2d Cir.

2002), cert. denied, 537 U.S. 1147 (2003).

As noted in my September 30, 2014 Report, Recommendation and Order [50], there is authority supporting the applicability of the government contractor defense to service contracts and subcontractors (id., pp. 15-16). However, at that time, I noted that Midwest ATC "must still establish that the government 'exercised *significant* control over [its] relevant actions'" (id., p. 17 *quoting* Densberger, 297 F.3d at 75 (emphasis in original)). Recognizing that Midwest ATC must only establish a colorable defense at this stage, a low threshold, I conclude that it has satisfied this burden. The record establishes that SOP 202 was drafted by the SATCO, a United States officer, and that it contained the procedures under which Midwest ATC's employees were acting at the time of the accident. As discussed above, Captain Kipp's September 6, 2010 e-mail and Von Campbell's deposition testimony reinforces the significant level of control and supervision he exercised over Midwest ATC's employees as the SATCO.

### 2. Combatant Activities Defense

The Federal Tort Claims Act bars suits against the federal government for "[a]ny claim arising out of the combatant activities of the military . . . during time of war." 28 U.S.C. §2680(j). I previously concluded in my September 30, 2013 Report, Recommendation and Order [50] that for this defense to apply, the claim need not arise from an act of military force directed at the plaintiffs (id., p. 17). However, from the record before me at that time, I was unable to determine whether the military "retained command authority" over Midwest ATC's activities (id., p. 18).

Recognizing that at this stage Midwest ATC's combatant activities defense be only colorable, rather than clearly sustainable, when the level of control exercised by the SATCO

over Midwest ATC's employees is coupled with the declaration  in Midwest ATC's subcontract that its services were "of utmost importance to the U.S. mobilization and wartime mission", the current record satisfies this threshold.[5]  Therefore, I conclude that Midwest ATC has satisfied the final element of the Isaacson test by demonstrating a colorable federal defense, and  recommend that plaintiffs' supplemental motion for remand be denied.


## CONCLUSION

For these reasons, I recommend that plaintiffs' supplemental motion to remand [60] be denied.  Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by November 10, 2014 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)).  Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".  Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the

---

[5]       The ultimate merit of Midwest ATC's defenses remains to be determined.  My conclusion is strictly limited to whether it has established a colorable defense for purposes of this motion.

proposed findings and recommendations to which objection is made and the basis for each

objection . . . supported by legal authority", and must include "a written statement either certifying

that the objections do not raise new legal/factual arguments, or identifying the new arguments and

explaining why they were not raised to the Magistrate Judge".  Failure to comply with these

provisions may result in the district judge's refusal to consider the objections.


DATED:   October 23, 2014

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge