UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JESSICA T. BADILLA, et al.,                                    **REPORT AND**
                                                               **RECOMMENDATION**

                            Plaintiffs,

v.                                                             12-CV-01066(A)(M)

MIDWEST AIR TRAFFIC CONTROL
SERVICE, INC., TRANSAFRIK INTERNATIONAL
 LTD., and TRANSAFRIK CORPORATION LTD.,

                            Defendants.
_____

          This action arises from the crash of National Airlines Flight 662 (a/k/a  TKU662)

into a mountain near Kabul Afghanistan International Airport ("KAIA") on October 12, 2010,

while *en route* from Bagram Air Base.  Before me is the motion of defendant Midwest Air

Traffic Control Service, Inc. ("Midwest ATC") for summary judgment [155], which has been

referred to me for preparation of a Report and Recommendation [13].[1]  Having reviewed the

parties' submissions [155, 162, 165, 166] and heard oral argument on March 21, 2017 [167], I

recommend that the motion be granted.


                                    **BACKGROUND**

          Plaintiffs, the alleged personal representatives of six crew members killed in the

crash, commenced this action on October 2, 2012 by filing a Summons and Complaint in State of

New York Supreme Court, County of Erie [1-3], asserting state law negligence claims.[2]  At the

---

[1]        Bracketed references are to the CM/ECF docket entries.

[2]         The action was removed to this court based upon diversity jurisdiction, pursuant to 28 U.S.C.
§§1332 and 1441 (Notice of Removal [1], ¶12), federal officer jurisdiction, pursuant to 28 U.S.C.
§1442(a)(1) (Supplemental Notice of Removal [5], ¶11), and federal enclave jurisdiction (id. ¶16).

time of the accident, Midwest ATC[3] provided certain air traffic control services at KAIA

pursuant to a subcontract with Readiness Management Services, LLC ("RMS"), which had a

prime contract with the United States military for those services. Midwest ATC's Statement of

Material Facts [155-2], ¶¶15, 27, 36.  Under the prime contract, RMSW employees were

designated "mission essential personnel", and provided "mission critical capabilities supporting

joint services military personnel, host nation military, and coalition forces, primarily in the

[United States Air Forces Central Command Area of Responsibility]". Id., ¶¶29-30.

Correspondingly, Midwest ATC's subcontract was governed by a Task Order, which stated that

its air traffic control services at KAIA were in support of "Operation Enduring Freedom", and

that those services were "part of an 'essential contract service' – therefore [its] personnel are

designated as mission essential personnel". Midwest ATC's Statement of Material Facts [155-2],

¶¶36-37; Task Order [155-31], p. 3 of 19.

   At the time of the accident, KAIA belonged to the Islamic Republic of

Afghanistan and its air traffic control tower was supervised by NATO.  Plaintiffs'

Counterstatement of Material Facts [162-4], ¶102; Adams deposition transcript [155-13], p. 43.

Because there were not enough NATO civilian air traffic controllers, United States Air Force air

---

Concluding that diversity and federal enclave jurisdiction were lacking, but that further development of
the record was necessary to determine whether federal officer jurisdiction existed, plaintiffs' initial
motion to remand was denied, without prejudice.  See September 30, 2013 Report, Recommendation and
Order [50], adopted, October 21, 2013 Order [51]. Following the completion of limited jurisdictional
discovery, plaintiffs filed a supplemental motion to remand [60], which was denied.  See October 23,
2014 Report and Recommendation [71], adopted, November 13, 2014 Order [72].

[3]  The remaining defendants have been dismissed from the action.  See July 1, 2015 Report and
Recommendation [92], adopted, August 20, 2015 Decision and Order [99] (granting the dismissal motion
of defendants Transafrik International Ltd. and Transafrik Corporation Ltd. (collectively "Transafrik"))
and January 12, 2017 Text Order [154] (approving the Stipulation of Order of Dismissal [153-2] filed by
defendants National Air Cargo, Inc., National Air Cargo Holdings, Inc., National Air Cargo Group, Inc.,
and National Air Cargo - Middle East FZE (collectively "NAC" )).

traffic controllers filled those positions prior to Midwest ATC.  Adams deposition transcript [155-13], p. 28.

The main purpose of the air traffic control tower at KAIA was to train Afghans to take over responsibility for the tower.  Plaintiffs' Counterstatement of Material Facts [162-4], ¶113.  Therefore, there were also Afghans and NATO civilian controllers in the control tower who trained during the day.  Adams deposition transcript [155-13], pp. 27-28.   At night, Midwest ATC personnel took over operations, but were not responsible for any training.  Id., pp. 27-29.  Most Midwest ATC controllers were retired United States military members.  Id., p. 29. Operational control and direction of the KAIA air traffic control tower came from the senior air traffic controller officer ("SATCO"), a United States Air Force officer.  Midwest ATC's Statement of Material Facts [155-2], ¶66; Hazrati deposition transcript [155-10], pp. 17-20 ("Basically SATCO was the boss"); Adams deposition transcript [155-13], pp. 10-11.  Under the Local Operating Procedures for KAIA, air traffic services were provided according to the Republic of Afghanistan Aeronautical Information Publication ("AIP") and all related International Civil Aviation Organization ("ICAO") annexes and documents.  Midwest ATC's Statement of Material Facts [155-2], ¶43.

Air traffic at KAIA was approximately 25% civil, and the remaining 75% was combat and other operations, including the movement of troops and their supplies. Midwest ATC's Statement of Material Facts [155-2], ¶53.  Although KAIA was designated as a civilian airport (Stevenson deposition transcript [155-14], p. 65), the movement of troops and armed combat aircraft were among KAIA's prime missions. Midwest ATC's Statement of Material Facts [155-2], ¶63.  It is undisputed that the safe and efficient operation of the KAIA air traffic control tower, a pivotal hub, was central to the combat mission of the United States and NATO.

Id., ¶¶54, 62.  KAIA was the subject of insurgent attacks on monthly basis.  Hazrati deposition

transcript [155-10], pp. 25-27; Adams deposition transcript [155-13], p. 53.

    The pilot of TKU662, Henry Beltran Bulos, a former Philippine Air Force pilot,

was employed by defendant Transafrik since 2000, and had flown in and out of KAIA

previously.  Bulos deposition transcript [155-16], pp. 51-54; Terrell deposition transcript [155-

17], pp. 22, 27, 134.  The accident occurred on the last sortie of the day when TKU622 was

returning to KAIA without cargo.  Terrell deposition transcript [155-17], p. 134.  The flight was

operating under visual flight rules ("VFR") *en route* to KAIA (Midwest ATC's Statement of

Material Facts [155-2], ¶14), meaning that "[i]t's the responsibility of air crew to see and avoid

hazards such as terrain and other aircraft".  Adams deposition transcript [155-13], p. 54; Terrell

deposition transcript [155-17], p. 13.

    Although it was uncommon to have VFR flights after sunset, this was a

designation chosen by the pilot.  Midwest ATC's Statement of Material Facts [155-2], ¶55;

Adams deposition transcript [155-13], p. 55; Terrell deposition transcript [155-17], pp. 14-15.

Because KAIA "resides within a 'bowl' of mountains" (Midwest ATC's Memorandum of Law

[165], p. 14; Terrell deposition testimony [155-17], p. 64 ("it's a bowl, and you sort of go up in

all directions to about 14-, 15,000 feet in some cases")), "it is difficult to fly VFR [at]

nighttime". Hazarti deposition transcript [155-10], pp. 28-29; Terrell deposition transcript [155-

17], pp. 63-64; Adams deposition transcript [155-13], p. 39 ("Flying into Kabul was not a place

for amateurs").  However, it is undisputed that when a pilot made a VFR flight into KAIA, it was

the responsibility of the pilot and his crew to see and avoid terrain and other aircraft.  Midwest

ATC's Statement of Material Facts [155-2],  ¶56.

TKU662 was equipped with a terrain avoidance warning system ("TAWS"), but the parties dispute whether it was operational. Plaintiffs' Counterstatement of Material Facts [162-4], ¶¶24-25. After TKU662 departed from Bagram for the approximately 10-minute flight to KAIA, Bagram Approach Control instructed Mr. Bulos to "resume own navigation to Kabul" and "maintain VFR". Plaintiffs' Counterstatement of Material Facts [162-4], ¶¶142, 151. Darrell Smith, a retired United States Air Force master sergeant and Midwest ATC employee, occupied the local controller position in the KAIA air traffic control tower[4] on the evening of October 12, 2010. Midwest ATC's Statement of Material Facts [155-2], ¶¶77, 83. The AIP designated the area of responsibility for local controllers at KAIA as Class D airspace, which encompasses a radius of six nautical miles around KAIA and up to 9,500 feet above sea level. Plaintiffs' Counterstatement of Material Facts [162-4], ¶143. Mr. Smith had a radar presentation available to him that was used as a visual aid for purposes of sequencing, but not as a control aid. Adams deposition transcript [155-13], p. 31. He had no resources available to him in the air traffic control tower that would alert him to the proximity of aircraft to terrain features. Midwest ATC's Statement of Material Facts [155-2], ¶21.

Mr. Smith established radio contact with TKU662 at 14:58:05. Plaintiffs' Counterstatement of Facts [162-4], ¶154. Typically, a VFR traffic pattern would be 1,500 feet above KAIA, which itself was approximately 4,860 feet above sea level. Terrell deposition transcript [155-17], p. 62; July 31, 2012 report of the National Transportation Safety Board ("NTSB") [162-9], p. 5 of 17. According to Mr. Smith, the tower radar display was down at that

---

[4]     The other positions in the tower were ground control, flight data/clearance delivery and watch supervisor. Plaintiffs' Counterstatement of Material Facts [155-2], ¶129.

time, but he did not inform TKU662 of that fact. Plaintiffs' Counterstatement of Material Facts [162-4], ¶¶195-96. He gave TKU662 clearance to land at 14:58:50. Id., ¶156. At that time, a civilian airline flight (Ariana 2748) was also on approach to land at KAIA. Id., ¶157; Midwest ATC's Statement of Material Facts [155-2], ¶85. While controlling both aircraft, at some point Mr. Smith was able to see their relative positions on the radar. Plaintiffs' Counterstatement of Facts [162-4], ¶160. Judging that the two aircraft were on a relatively close approach, at 15:00:17 Mr. Smith asked "TKU662. . . can you extend your downwind sir"? (i.e., continue parallel to the runway in the opposite direction from the approach). Midwest ATC's Statement of Material Facts [155-2], ¶86; [169]. Mr. Bulos confirmed that he could do so, and at no time advised Mr. Smith that he anticipated any difficulty extending his downwind leg. Midwest ATC's Statement of Material Facts [155-2], ¶¶87-88.

Approximately five seconds after Mr. Bulos confirmed that he could extend his downwind, Mr. Smith cancelled the landing clearance for TKU662, and stated "make a left turn and . . . report established on your downwind you'll be number two to follow a airbus". Plaintiffs' Counterstatement of Material Facts [162-4], ¶162; [169]. According to the NTSB report [162-9], that led TKU662 "directly into the terrain it would impact". Id., p. 9 of 17. It is not evident whether Mr. Smith stated "make a left turn" when TKU662 was outside of Class D airspace or whether that instruction took TKU662 out of "Class D" airspace. Plaintiffs' Counterstatement of Material Facts [162-4], ¶¶165, 167. In any event, it is undisputed that Mr. Smith never informed Mr. Bulos that he was out of Class D airspace. Id., ¶168.

At 15:01:47 Mr. Smith stated "TKU662 continue downwind I'll call your base" (i.e., advise when Ariana 2748 had progressed sufficiently to permit TKU662 to land). Plaintiffs' Counterstatement of Material Facts [162-4], ¶169; Midwest ATC's Statement of Material Facts

[155-2], ¶94.  The parties sharply dispute whether that statement was an Air Traffic Control

Instruction as defined by the AIP,[5] which would have required any deviation from that

instruction to be cleared by air traffic control absent a declared emergency.   Plaintiffs'

Counterstatement of Material Facts [162-4], ¶¶169, 177.  During that same transmission, Mr.

Smith also stated that the "traffic you're following is . . . now at your three o'clock" [169].

Mr. Smith testified that within seconds of his last communication with TKU662,

which occurred at 15:01:53 (six seconds after Mr. Smith stated "I'll call your base), he saw a

fireball.  Smith deposition transcript [155-19], p. 59; [169].  TKU662 impacted a mountain at

7,874 feet above sea level, approximately 10 to 12 miles away from KAIA.     NTSB Report

[162-9], p. 1; plaintiffs' Counterstatement of Material Facts [162-4], ¶148.  It is undisputed that

the air traffic tower radar presentation did not display the altitude of TKU662 and Mr. Smith did

not assign an altitude to TKU662.  Midwest ATC's Statement of Material Facts [155-2], ¶¶91,

93.  However, the local controllers were expected to be aware of the minimum safe altitudes for

aircraft operating in their area. Plaintiffs' Counterstatement of Material Facts [162-4], ¶139.

Midwest ATC's counsel confirmed at oral argument that it was dark at the time of

the crash (approximately 7:30 p.m. local time).  The NTSB's accident report [162-9] stated that it

was "difficult to determine how much illumination the stars provided due to the haze, but the

moon, due to its low position in the sky and waxing crescent size, would have provided limited

additional light".  Id., p. 13 of 17.  Consistent with the conditions, Mr. Smith did not visually

observe TKU662 while communicating with it.  Plaintiffs' Counterstatement of Material Facts

[162-4], ¶200.

---

[5]      The AIP [155-36] defines Air Traffic Control Instructions as being "[d]irectives issued by air
traffic control for the purpose of requiring a pilot to take a specific action".  Id., p. 29 of 211, §Gen. 2.2.

Plaintiffs allege that Midwest ATC was negligent by instructing TKU662 to "to execute an approach downwind . . . when it knew or should have known such instruction was unsafe and dangerous"; failing "to provide . . . a warning [that TKU662] was below the minimum safe altitude"; failing "to provide necessary instruction to keep a safe and proper separation . . . [from] the surrounding terrain"; failing "to inform [TKU662] of discrepancies between actual altitude indications available to the controllers and the reported altitude from the flight crew"; failing "to inquire, instruct or warn the crew . . . of a defective or malfunctioning transponder during the control of the flight"; and/or failing "to provide proper and safe instructions, warnings, and/or other air traffic control services to [TKU662]". Amended Complaint [95], ¶39. Midwest ATC has counterclaimed against the estate of Mr. Bulos for indemnification. Amended Answer with Counterclaim [112], ¶¶34-43.

## ANALYSIS

Midwest ATC raises two arguments in support of its motion: first, that plaintiffs' claims are preempted under the "combatant activities" exception to the Federal Tort Claims Act ("FTCA"); and second, that it had no duty to provide terrain separation, which is the sole duty of a pilot flying under VFR. Midwest ATC's Memorandum of Law [155-3], Points I and II.

### A.    Summary Judgment Standard

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining

-8-

whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant.  Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

### B.    Are Plaintiffs' Claims Preempted by the FTCA's Combatant Activities Exception?

The FTCA abrogates the government's sovereign immunity for state-law torts committed by its employees (see 28 U.S.C. §1346(b)(1)), but carves out certain exceptions, including the combatant activities exception, which preserves the government's immunity for "[a]ny claim arising out of the combatant activities of the military . . .  during time of war". 28 U.S.C. §2680(j).  Since "government contractors are expressly excluded from the scope of the FTCA", Aiello v. Kellogg, Brown & Root Services., Inc., 751 F. Supp. 2d 698, 706 (S.D.N.Y. 2011), Midwest ATC instead argues that plaintiffs' claims are preempted by federal law because imposing tort liability "would critically undermine the federal interest the combatant activities exception to the [FTCA] was intended to protect, namely the elimination of tort law from the battlefield".  Midwest ATC's Memorandum of Law [155-3], p. 6.

In support of its preemption argument, Midwest ATC relies upon Boyle v. United Technologies Corp., 487 U.S. 500 (1988).  Midwest ATC's Memorandum of Law [155-3], pp. 7-8.  There, a Marine helicopter co-pilot drowned when he was unable to escape from the submerged aircraft because the escape hatch – designed pursuant to government specifications – opened outward, rather than inward. Boyle, 487 U.S. at 503.  Addressing the circumstances under which "a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect", the Court applied the doctrine of

conflict preemption, which allows state law to be preempted "[in] a few areas, involving 'uniquely federal interests'", when "a 'significant conflict' exists between an identifiable 'federal policy or interest and the operation of state law' . . . or the application of state law would 'frustrate specific objectives' of federal legislation". Id., 504, 507.[6]

Applying that test, the Court held that the "uniquely federal interests" implicated were "the civil liabilities arising out of the performance of federal procurement contracts" (id., 506), explaining that "either the contractor will decline to manufacture the design specified by the Government, or it will raise its price.  Either way, the interests of the United States will be directly affected". Id., 507.  It then concluded that a significant conflict existed between the federal policy, as embodied in the discretionary function exception to the FTCA,[7] and state law because the "the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape hatch mechanism shown by the specifications)". Id., 509.  To limit the scope of displacement of state law, the Court crafted the government contractor defense, which precludes liability pursuant to state law when "(1) the United States approved reasonably precise specification; (2) the equipment conformed to those

---

[6]     In addition to conflict preemption, there is "express preemption, where Congress has expressly preempted local law" and "field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law". New York. SMSA Limited Partnership v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010).

[7]     The discretionary function exception of the FTCA preserves immunity for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused". 28 U.S.C. §2680(a).

specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known of the supplier but not to the United States". Id., 512.

The Court has described Boyle as a "special circumstance" that applies "where the government has directed a contractor to do the very thing that is the subject of the claim". Correctional Services. Corp. v. Malesko, 534 U.S. 61, 74 n. 6 (2001). *See also* Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1317 (11th Cir. 1989) ("Boyle, by its terms, applies only to defects in design"). However, its analysis has been extended to the combatant activities exception of the FTCA to preempt negligence claims against government contractors. It was initially applied in Koohi v. United States, 976 F.2d 1328 (9th Cir.1992) to preempt claims against defense contractors for an allegedly defective missile defense system that caused a civilian aircraft to be shot under the rationale "that one purpose of the combatant activities exception is to recognize that during wartime encounters no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action". Id., 1337.

Application of Boyle was then extended beyond the product liability context in Saleh v. Titan, 580 F.3d 1 (D.C. Cir. 2009), where Iraqi nationals alleged that they were abused by military contractors who provided interrogation and interpretation services to the government at the Abu Ghraib military prison during the war in Iraq. Although drawing upon the Boyle preemption analysis, Saleh recognized that the area of conflict between state law and the federal interests associated with the combatant activities exception of the FTCA, which "casts an immunity net over any claim that *arises* out of combatant activities" (id., p. 6 (emphasis in original)), was much broader than the conflict rising from the discretionary function exception addressed in Boyle:

-11-

"The nature of the conflict in this case is somewhat different from that in <u>Boyle</u> - a sharp example of discrete conflict in which satisfying both state and federal duties (*i.e*., by designing a helicopter hatch that opens both inward and outward) was impossible. In the context of the combatant activities exception . . . .  it is the imposition *per se* of the state or foreign tort law that conflicts with the FTCA's policy of eliminating tort concepts from the battlefield. The very purposes of tort law are in conflict with the pursuit of warfare. Thus, the instant case presents us with a more general conflict preemption, to coin a term, 'battle-field preemption': the federal government occupies the field when it comes to warfare, and its interest in combat is always 'precisely contrary' to the imposition of a non-federal tort duty." <u>Id</u>., p. 7. [8]

In tailoring the scope of displacement of the state law "so as to coincide with the bounds of the federal interest being protected", <u>Saleh</u> held that: "[d]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted." <u>Id</u>., pp. 8-9.

Although the Second Circuit has not addressed this issue, the Third and Fourth Circuits - joining the D.C. and Ninth Circuits, as well as one district in this Circuit, have applied the reasoning of <u>Boyle</u> to the combatant activities exception of the FTCA.  *See* <u>Harris v. Kellogg Brown & Root Services, Inc.</u>, 724 F.3d 458, 480 (3d Cir. 2013); <u>In re KBR, Inc., Burn Pit Litigation</u>, 744 F.3d 326, 350-51 (4th Cir. 2014)); <u>Aiello</u>, 751 F.Supp.2d at 707-11.

---

[8]      Although "battle-field preemption" is more appropriately characterized as a "type of field preemption", it has been recognized that it "is a rational extension of <u>Boyle</u>, which itself suggested that such areas of field preemption would exist". <u>Aiello</u>, 751 F.Supp.2d at 710-11.

1.    **Should <u>Boyle</u>'s Preemption Analysis be applied here?**

Plaintiffs argue that the court should "decline to follow those cases that expand sovereign immunity of the Government beyond the holding of [<u>Boyle</u>]", noting that expansion of the FTCA's combatant activity exception to private contractors "is more properly left to Congress".  Plaintiffs' Memorandum of Law [162], pp. 8, 12.  They point to two decisions - both prior to <u>Saleh</u> - that rejected the application of the preemption analysis of  <u>Boyle</u> to the combatant activities exception. In <u>McMahon v. Presidential Airways, Inc.</u>, 460 F. Supp. 2d 1315, 1330 (M.D. Fla. 2006), <u>aff'd on other grounds</u>, 502 F.3d 1331 (11th Cir. 2007), the court explained that it:

> "find[s] no persuasive authority for the conclusion that the combatant activities exception preempts state tort law claims. The combatant activities exception to the FTCA is an explicit legislative preservation of sovereign immunity, while the government contractor defense is a judicially recognized affirmative defense, grounded in federal preemption and the discretionary function exception to the FTCA. The latter defense shields contractors only in military equipment procurement contracts and only when the government dictates design specifications. Private contractors are not entitled to sovereign immunity unless they are characterized as government employees, which Defendants are not. . . . There is no express authority for judicially intermixing the government contractor defense and the combatant activities exception; nor is there authority for bestowing a private actor with the shield of sovereign immunity. Until Congress directs otherwise, private, non-employee contractors are limited to the government contractor defense and <u>Boyle</u>'s preemption analysis. Unless they qualify as employees or agents of the Government, private contractors may not bootstrap the Government's sovereign immunity."

*See also* <u>Fisher v. Halliburton</u>, 390 F. Supp. 2d 610, 616 (S.D. Tex. 2005) ("[p]laintiffs' claims in this case do not involve any allegation that Defendants supplied equipment, defective or otherwise, to the United States military. The Court concludes that extension of the government

contractor defense beyond its current boundaries is unwarranted and the FTCA does not bar Plaintiffs' claims").

Plaintiffs also rely upon the dissent in <u>Saleh</u>, which similarly argued that "Congress knows full well how to make its intention to preclude private liability known", but "has not done so here". 580 F.3d at 26 (Garland, J., dissenting). The dissent further argued that courts should "hesitate to extend <u>Boyle</u> beyond the scope of the discretionary function exception and direct-conflict rationale" it employed, explaining that "[a]t the heart of <u>Boyle's</u> analysis is the doctrine of conflict preemption. . . . [P]reemption under the discretionary function exception is in accord with that doctrine, as it requires 'a sharp example of discrete conflict in which satisfying both state and federal duties (i.e., by designing a helicopter hatch that opens both inward and outward) was impossible.' . . . By contrast, preemption under the combatant activities exception is extraordinarily broad; . . . it results not in conflict preemption but in 'field preemption.'" <u>Id.</u>, 21, 23.

Faced with these conflicting authorities – none of which are controlling – I am most persuaded by the weight of authority supporting the application of <u>Boyle</u> to the combatant activities exception of the FTCA, especially post-<u>Saleh</u>. Although it is unclear whether the Supreme Court intended its analysis in <u>Boyle</u> to extend beyond the design defect context and the discretionary function exception of the FTCA, the preemption principles that underlie <u>Boyle</u> and <u>Saleh</u> are not new. Nor do plaintiffs persuasively argue against the application of preemption here. While they contend - like in <u>McMahon</u> and the dissent in <u>Saleh</u> - that the task of expanding the FTCA's combatant activity exception to private contractors should be left to Congress (plaintiffs' Memorandum of Law [162], p. 12), Midwest ATC is not seeking a grant of sovereign immunity under the FTCA, but rather is relying on the doctrine of

preemption.  *See* <u>Rodriguez v. Lockheed Martin Corp</u>., 627 F.3d 1259, 1265–66 (9th Cir. 2010) ("[a]lthough the source of the government contractor defense is the United States' sovereign immunity . . .  the government contractor defense does not confer sovereign immunity on contractors").

   Plaintiffs also argue that no conflict with an identifiable federal policy exists here because "there are no issues that potentially implicate military decision making or judgment sought to be protected and promoted in <u>Boyle</u>, or any of the other cases that address the manufacture and supply of military hardware and sophisticated weaponry".  Plaintiffs' Memorandum of Law [162], p. 11.  However, that argument ignores that broad field preemption which flows from the federal interest embodied in combatant activities exception of  eliminating "'tort from the battlefield'", which  "suggests that any non-federal substantive negligence law will cause 'significant conflict' with that interest." <u>Aiello</u>, 751 F.Supp.2d at 710.

   In any event, even absent the broad field preemption of the combatant activities exception (*see* <u>Saleh</u>, 751 F.Supp.2d at 710-11), plaintiffs' claims against Midwest ATC in this case implicate military decision making and judgment.  As argued by Midwest ATC, it is undisputed that the equipment available to its controllers in the KAIA air traffic controller tower was supplied by the United States military, and that at the time of the accident there were no resources in the tower that alerted the controllers to the proximity of an aircraft to a specific terrain feature. Midwest ATC's Reply Memorandum of Law [165], pp. 7-8; Statement of Material Facts [155-2], ¶¶21, 31-32.  The prime contract between RMS and the United States also stated that the work would be provided in accordance various guidelines, including the ICAO standards, which make clear that "[t]he objectives of the air traffic control service . . .  do not include prevention of collision with terrain.  The procedures prescribed in this document do

-15-

not relieve pilots of their responsibility to ensure that any clearances issued by air traffic control

units are safe in this respect." ICAO 4444 [155-39], p. 106 of 223, § 5.9, Note 3.

Therefore, the core of the plaintiffs' claim - that Midwest ATC failed to provide

terrain separation services to flight TKU662 - at least partially implicates the military's decision

to not equip the KAIA air traffic control tower with resources to provide that service or to adopt

guidelines that made terrain separation the responsibility of the controllers.


**2.      Do the Activities in this Case Qualify as Combatant Activities?**

Alternatively, plaintiffs argue that even if the combatant activity exception of the

FTCA could be applied to preempt negligence claims against civilian contractors, "the facts of

th[is] . . . case are not the type of incidental activity that should qualify as 'combatant activity'

for purposes of the FTCA and preemption of [their] claims". Plaintiffs' Memorandum of Law

[162], p. 12. Courts have adopted an expansive definition of "combatant activity" as used in the

FTCA, to "include not only physical violence, but activities both necessary to and in direct

connection with actual hostilities". Johnson v. United States, 170 F.2d 767, 770 (9th Cir. 1948).

For example, in Aiello, the plaintiff was injured when he fell in a latrine facility located on a

"forward operating base" in Iraq. 751 F.Supp.2d at 701. There, the court found that the

plaintiff's claim arose from a combatant activity, since the defendant, who operated and

maintained the latrine facility, provided "basic life support services for active military

combatants on a forward operating base" and its creation and maintenance of the latrine

constituted "active logistical support of combat operations, both necessary to and in direct

connection with actual combat". Id., 702, 712-13. Also relevant to the court's determination was

the fact that the base was subject to actual hostilities in the form of nearby mortar and rocket

attacks. Id., 713.   Similarly in Harris, the court held that the "maintenance of electrical systems at a barracks in an active war zone qualifies as integration into the military's combatant activities".  724 F.3d at 481

Plaintiffs press for a narrower test that focuses solely on the conduct undertaken at the time of the crash, arguing that "[t]he crash . . . was not caused by any activity or involvement in combatant activities; rather, it was caused by the Tower Controller's error in providing air traffic control services to a civilian cargo plane while simultaneously providing control services to a commercial airliner. . . . [A]ll three of the controllers in the tower of a civilian airport . . . were civilian Midwest ATC employees and the only aircraft that they were providing control services for were civilian owned and operated and performing civil flights". Plaintiffs' Memorandum of Law [162], p.  13.  However, that argument ignores the plain wording of the Saleh test, which focuses on the activities of the military by broadly requiring the contractor to be "integrated into combatant activities", rather than more narrowly requiring the contractor to be conducting combatant activities.  See Aiello, 751 F.Supp.2d at 715 ("[b]ecause plaintiff's claim . . . arises from combatant activity of the military . . . [it] is preempted" (emphasis added)).[9]

Plaintiffs' reliance on Brokaw v. Boeing Company, 137  F.Supp.3d 1082 (N.D. Ill. 2015) (plaintiffs' Memorandum of Law [162], p. 10) does not compel a different result.   As in this case, Brokaw involved the crash of a government contractor's plane in Afghanistan operated pursuant to a contract between the government and NAC. 137 F.Supp.3d at 1089. The crash, which occurred while the plane departed from Bagram Air Base on re-fueling stop, was

---

[9]       It is unnecessary for me to address the other prong of the Saleh test (i.e., whether the military retained command authority), which is unchallenged by plaintiffs.

caused by the military cargo aboard breaking loose from its moorings and penetrating a bulkhead.  Id.

Addressing whether the case was properly removed under federal officer jurisdiction, the court concluded that remand was warranted since NAC had failed to meet the third of four elements necessary to establish federal officer jurisdiction, namely whether there was a casual nexus between the federal authority and the conduct challenged. Id., pp. 1096, 1099. While acknowledging that that conclusion "ended the inquiry", it continued "[f]or the sake of completeness" to consider the final element:  whether NAC had established a colorable federal defense. Id., p. 1099.  Among the defenses it analyzed was the combatant activities exception.  In concluding that it did not provide a colorable defense, the court assumed, without deciding, that the combatant activities exception applied to private contractors, but rejected the argument that NAC was engaged in a combatant activity:  "the activities NAC engaged in that gave rise to this lawsuit 'cannot logically be cataloged' as combatant. . . .  NAC's role was simply to transport cargo. Admittedly, it was carrying military equipment and operating in a war zone, but it was not aiding the military in swinging the 'sword of battle'; in essence, it was helping National Airlines carry the sword for the military's later use. . . . This is not the type of incidental activity that should qualify as 'combatant' for purposes of the FTCA." Id., p. 1106.  The court also distinguished both Saleh and Aiello "as they involved paramilitary personnel or activities that were much closer to actual hostilities". Id.

While the limited facts (and analysis) presented in Brokaw appear to support plaintiffs' position, it was only in *dicta* that the court analyzed the combatant activities exception. *See* Paul v. Gonzales, 444 F.3d 148, 155 (2d Cir. 2006) (treating an analysis conducted in the interest of completeness as *dicta*).  In addition, while the court relied upon the

lack of close proximity between NAC's activities and actual hostilities to distinguish <u>Saleh</u> and

<u>Aiello</u>, it is undisputed that KAIA was subject to insurgent attacks. *See* Hazrati deposition

transcript [155-10], pp. 25-27; Adams deposition transcript [155-13], p. 53.

   Therefore, I conclude that plaintiffs' claims are preempted, and recommend that

Midwest ATC's motion be granted on that basis.  However, recognizing that without any

controlling authority from the Supreme Court or Second Circuit addressing the expansion of

<u>Boyle</u>'s preemption analysis to the considerably broader combatant activities exception of the

FTCA, the state of the law remains unsettled,[10] I will also analyze Midwest ATC's alternative

ground for dismissal.


### C. Is Midwest ATC Liable for the Accident Under Common Law?

   "Under New York law, the elements of a negligence claim are: (i) a duty owed to

the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that

breach." <u>Lombard v. Booz-Allen & Hamilton, Inc</u>., 280 F.3d 209, 215 (2d Cir. 2002).  Midwest

ATC argues that plaintiffs' negligence claims must be dismissed, since terrain separation is the

sole duty of the pilot flying under VFR, and that Mr. Bulos' failure to uphold his VFR

responsibilities was the sole proximate cause the accident.  Midwest ATC's Memorandum of

Law [155-3], Point II.

---

[10] *See* Major Jeffrey B. Garber, <u>The (Too) Long Arm of Tort Law: Expanding the Federal Tort Claims Act's Combatant Activities Immunity Exception to Fit the New Reality of Contractors on the Battlefield</u>, Army Law, September 2016,  *19 ("the state of the law remains unpredictable and unevenly applied"); <u>McManaway v. KBR</u>, Inc., 554 Fed. Appx. 347, 353 (5th Cir. 2014) (Jones, J., dissenting) ("the scope of this exemption must be determined by the Supreme Court").

### 1.    Did Midwest ATC Have any Duty to TKU662 for Terrain Separation?

"While general negligence law applies to airplane tort cases . . . the standard of due care is concurrent, resting upon both the airplane pilot and ground aviation personnel. Both are responsible for the safe conduct of the aircraft." Spaulding v. United States, 455 F.2d 222, 226 (9th Cir. 1972); Redhead v. United States, 686 F.2d 178, 182 (3d Cir. 1982) ("[b]oth the pilot and the air traffic controller owe a duty of care to passengers in an airplane").[11]    Although the duty of care is concurrent, "the pilot has final authority, even over air traffic controllers". In re: Air Crash Near Rio Grande, Puerto Rico, on Dec. 3, 2008, 2016 WL 6916600, *4 (S.D. Fla. 2016).  "Necessarily, the pilot's knowledge of his own, his crew's, and his aircraft's capabilities and limitations, is of preeminent importance in this cooperative situation. None of these matters can be known by [air traffic control]". Turner v. United States, 736 F. Supp.2d 980, 1000 (M.D.N.C. 2010).  Nor are air traffic controllers "to get into the cockpit and fly the plane for the pilot", United States Aviation Underwriters Inc. v. United States, 682 F. Supp.2d 761, 768 (S.D. Tex. 2010), or "presumed to have X-ray vision and extrasensory perception". Biles v. United States, 848 F.2d 661, 663 (5th Cir. 1988).

Notwithstanding these limitations, controllers remain "under a duty to provide certain information and warnings to the pilot so that he has the opportunity to make a competent

---

[11]    Both parties evaluate plaintiffs' negligence claims under New York law and make no argument that it conflicts with the law of any other applicable jurisdiction.  Therefore, I have applied New York law.  See Clarkson Co. v. Shaheen, 660 F.2d 506, 512 n. 4 (2d Cir. 1981) ("none of the parties claimed the applicability of Canadian law or asserted that it differs from that of New York. Each seems to have assumed that New York law governs. Hence, the district court was not obligated to take judicial notice of Canadian law and correctly applied forum law"); Corporacion Venezolana de Fomento v. Vintero Sales Corp., 452 F. Supp. 1108, 1112 n. 3 (S.D.N.Y. 1978) (applying New York law where "the parties have not sought to prove Venezuelan law . . . or asserted that it is in conflict with the law of New York").

decision as to the operation of his aircraft". <u>Richardson v. United States</u>, 372 F. Supp. 921, 925-26 (N.D. Cal. 1974). *See also* <u>Webb v. United States</u>, 840 F. Supp. 1484, 1514 (D. Utah 1994) ("[c]ontrollers have the responsibility to promote the safe, orderly, and expeditious flow of air traffic"); <u>Redhead</u>, 686 F.2d at 182 (controllers "are often a source of vital information" to the pilots). "[T]he key element in distinguishing the respective duties of pilot and [air traffic controllers] relates to the ability of the former to perceive a potential danger without assistance from the latter. As a result, a balancing process is involved - the vantage point of the pilot will be weighed against the Tower's superior knowledge or awareness of the pilot's danger." <u>Richardson</u>, 372 F.Supp. at 926.  Thus, "[e]ven if a controller issues a wrong heading or instruction, the pilot has the 'primary duty to avoid a hazard that he himself could or should have perceived.'" <u>Airplanes of Boca, Inc. v. United States of America</u>, 254 F.Supp.2d 1304, 1312 (S.D. Fla. 2003).

"The nature and extent of an air traffic controller's duty of due care to pilots is a question of law." <u>First of America Bank-Central v. United States</u>, 639 F. Supp. 446, 455 (W.D. Mich. 1986); <u>Palomo v. United States</u>, 2000 WL 33935645, *11 (S.D. Miss. 2000), <u>aff'd</u>, 45 Fed. App'x 325 (5th Cir. 2002).  It is measured by the "1) applicable . . . manuals and 2) a common law duty of reasonable care". <u>Wojciechowicz v. United States</u>, 576 F. Supp.2d 241, 272 (D.P.R. 2008), <u>aff'd</u>, 582 F.3d 57 (1st Cir. 2009).

Midwest ATC argues that "neither the international standards that defined [its] duties, nor the common law duty of reasonable care, imparted a duty on [it] to provide terrain separation services to a VFR aircraft".  Midwest ATC's Memorandum of Law [155-3], p. 28.  In contrast to a flight under instrument flight rules, where "it is presumed that pilots are unable to see either other aircraft or the ground and are guided by air traffic controllers", it is generally

recognized that a pilot flying under VFR "directs his aircraft according to what he can see, navigating from place to place according to visual cues outside his aircraft". <u>Redhead</u>, 686 F.2d at 180 n.1. That principle is embodied in the controlling documents. As discussed above, ICAO 4444 states that "[t]he objectives of the air traffic control service as prescribed in Annex 11 do not include prevention of collision with terrain. The procedures prescribed in this document do not relieve pilots of their responsibility to ensure that any clearances issued by air traffic control units are safe in this respect." [155-39], p. 106 of 223, §5.9, Note 3. Similarly, the AIP provides that "[u]ltimate responsibility for . . . terrain avoidance rests with the pilot". [155-36], p. 87 of 211, §3.1.5.3.

Although plaintiffs point to other provisions in the controlling documents as establishing that the controllers at KAIA had a responsibility for terrain separation, their expert, Julia Harvey, acknowledged that the controlling documents do not specifically set forth that responsibility. Harvey deposition transcript [155-23], pp. 43-44. While their other expert, Colin Sommer, testified that Section 2.2 of Annex 11 to ICAO 4444, which sets forth the general objective of air traffic control to provide advice and information useful for the safe and efficient conduct of flights, encompasses the controller's responsibility for terrain separation (Sommer deposition transcript [155-25], p. 39), that interpretation is expressly contradicted by ICAO 4444, which states that "[t]he objectives of the air traffic control service *as prescribed in Annex 11* do not include prevention of collision with terrain". [155-39], p. 106 of 223, §5.9, Note 3 (emphasis added).

Consistent with the controlling documents setting forth the responsibilities of local controllers at KAIA, "[t]he case law is incontrovertible that an aircraft operating pursuant to [VFR] must provide its own navigation and clearance from obstructions. The duty to operate

the aircraft, and to navigate, is assigned to the pilot who must provide his own separation from obstructions . . . while in VFR conditions." In re: Air Crash Near Rio Grande, Puerto Rico, 2016 WL 6916600, *5; Webb, 840 F. Supp. at 1513 ("[d]uring a VFR flight, the pilot has the responsibility to provide his own separation from obstructions"); McDaniel v. United States, 553 F. Supp. 910, 916 (N.D. Cal. 1982) ("[a]s a VFR pilot, Dr. McDaniel had no right, and could not reasonably expect, to rely on 'outside input' from the ATC to provide his separation from terrain").

Nevertheless, the fact that "[a]voiding terrain is the VFR pilot's continuing responsibility and that responsibility cannot be delegated in whole or in part to air traffic control . . . this does not relieve an [air traffic controller] from issuing a safety alert if he is *aware* that the aircraft is at an *altitude* which, in the controller's judgment, places the aircraft in unsafe proximity to terrain obstructions or other aircraft". Wojciechowicz, 576 F. Supp.2d at 253 (emphasis in original). *See* In re: Air Crash Near Rio Grande, Puerto Rico, 2016 WL 6916600, *8 ("[t]he duty to issue a terrain alert  arises if a controller is *aware* that an aircraft is in *unsafe* proximity to terrain" (emphasis in original)). *See also* Turner v. United States, 736 F. Supp.2d 980, 1008 (M.D.N.C. 2010) ("[c]ourts have found that air traffic controllers have a common law duty to issue warnings beyond those required by the manuals in the following situations: (1) when danger to the aircraft is immediate and extreme . . . ; (2) when the air     traffic controller is able to gather more information or make more accurate observations than the pilot . . . ; (3) when the controller is better qualified than the pilot to evaluate the danger. . . ; (5) when danger is 'reasonably apparent' to the controller but not apparent, in the exercise of due care, to the pilot . . . ; and (6) when the controller has conveyed dangerously inaccurate or misleading information to the pilot").

Applying these principles, plaintiffs argue that Mr. Smith assumed a shared duty for terrain separation when he "took positive control of the TKU662 through the issuance of Air Traffic Control Instructions concerning the flight path of TKU662 and that he was then negligent in the control he exercised outside of his 'Class D' area of authority and in the instructions that he gave and failed to give, to TKU662 which contributed to its controlled flight into terrain". Plaintiffs' Memorandum of Law [162], p. 16. However, that theory is not supported by the following testimony of Ms. Harvey - plaintiffs' own expert:

> "A.     . . . [M]y opinion is that he was under the . . . instruction of the controller being I will call your base, that's a very powerful instruction that the controller is giving that pilot.
>
> Q.     But you agree with me that in the meantime, until his base was called, the VFR pilot's duty is to maintain a separation from terrain; correct?
>
> A.     It's his duty to maintain a separation against terrain." Harvey deposition transcript [155-23], pp. 56-57.
>
>                                       . . .
>
> "Q.     But [Mr. Bulos] never indicated back to the tower, I'm forfeiting my responsibilities as a VFR pilot . . . .
> A.     No. . . . But VFR pilots can still be controlled, and they don't have to then go, all right am I IFR now. You can still be VFR and accept a vector, accept identification, accept a height change, a level change, altitude change.
>
> Q.     And at all times it needs to be VFR, however. He has the sole and exclusive responsibility to separate himself from terrain; correct?
>
> A.     Correct." Id., pp. 116-17.

Nevertheless, plaintiffs' position does find support in the following testimony from their other expert, Mr. Sommer:

> "Q.     . . . An aircraft operating pursuant to [VFR] must provide its own navigation and clearance from obstructions. Do you agree with that statement . . . ?

A.      I agree with it in that they should be navigating the airplane, but when
        they are being controlled, then they are under the direction of air traffic
        control.  Air traffic control is giving them instruction.  They can't just
        deviate from that instruction.

Q.      There was never an instruction given to this aircraft . . . to fly according to
        a specific vector, or a specific compass direction, was there?

A.      I would have to disagree with you with that.  He was instructed to fly
        downwind at the heading of one one zero after making a left turn".
        Sommer deposition transcript [155-25],  pp. 69-70.

                                          . . .

Q.      It's always the pilot's responsibility to determine his spatial relationship to
        his terrain?

A.      It is not the pilot's sole responsibility.  It is also the responsibility of the
        controller not to direct him to fly into the side of that mountain."  Id., pp.
        71-72.

                                          . . .

 Q.     . . . Do the [authorities] that are given credence in the aviation industry
        define VFR as principally the sole responsibility of the pilot to see and
        avoid terrain and other aircraft?

[A.]    Final authority is the word that is used most often; not sole responsibility.
        It's a shared responsibility between the pilot and the controller, if he's
        under air traffic control."  Id., p. 95.

                                          . . .

Q.      Was there ever any information shared, at any point during this flight, that
        gave the tower controller reason to believe that the pilot could not
        maintain his separation from terrain?

[A.]    The pilot never indicated that he wasn't able to do so, but he wasn't asked,
        either.  The pilot conducted the flight in accordance with his own
        navigation per the instruction that he got . . . when he initially departed
        Bagram. Then his own navigation was taken away from him at the point
        where his clearance was revoked and where he was told to turn left.  So
        there isn't any indication that he's incapable of maintaining separation
        from the obstacle, but he is relying on air traffic control not to steer him
        into one."  Id., p. 96.

                                          -25-

Further explaining why Mr. Smith's conduct gave rise to a duty for terrain separation, Mr. Sommer testified that while Mr. Bulos was in class D air space, "he's at pattern altitude" and "[t]here should be no risk of any type that he's going to run into anything". Id., p. 49.  However, Mr. Bulos "wouldn't necessarily know that he had just left class D air space, and . . . he would surely not expect that the controller would direct him outside of the class D air space into areas that have extensive high terrain. . . . [H]e would expect that [air traffic control] knows where he is based upon the vernacular that he was using in regard to the other aircraft, in regard to what he should be able to see out his three clock.  He knows . . . that the controller can see him on the scope. He doesn't know that he just left class D air space, and he wouldn't know to turn the TAWS back on". Id., p. 52.  Mr. Sommer testified that if  Mr. Smith did not know what the terrain was like outside of his air space, he should not have been giving instructions to operate outside of that air space without telling TKU662 to "maintain VFR", a "very common term[ ] that controllers use all the time because they want to make sure that pilots are . . . aware if any . . . terrain could be a danger to them" (id., pp. 72-73), and that by failing to receive that direction, Mr. Bulos "was trusting that the controller was vectoring him in the appropriate manner so that he wouldn't impact terrain". Id., p. 93. *See also* p. 82 ("If [air traffic control] establish that an aircraft that is under their control should maintain VFR . . . then it is up to the pilot completely. [Air traffic control] is absolving themselves of that responsibility").

Midwest ATC argues that Mr. Sommer's definition of VFR, "which expresses a joint responsibility between pilot and air traffic controller for a VFR aircraft's terrain separation, does not correlate with any document or testimony that is part of the record" and fails to meet the standard of reliability set forth in Daubert v. Merrell Dow Pharmaceuticals,  509 U.S. 579, 597 (1993).  Midwest ATC's Memorandum of Law [155-3], p. 39.   "[S]ummary judgment is not *per*

*se* precluded because there are conflicting experts." <u>Dalberth v. Xerox Corp.</u>, 766 F.3d 172, 189 (2d Cir. 2014); <u>Colon ex rel. Molina v. BIC USA, Inc.</u>, 199 F. Supp. 2d 53, 71 (S.D.N.Y. 2001) ("[n]othing in <u>Daubert</u>, or any other Supreme Court or Second Circuit case, mandates that the district court hold a Daubert hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion").    "The court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment." <u>Dalberth</u>, 766 F.3d at 189.  Thus, "[a]n expert's conclusory opinions", including those "without factual basis . . .  [are] inappropriate material for consideration on a motion for summary judgment". <u>Major League Baseball Properties, Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 311 (2d Cir. 2008).

Absent from the common law duty of reasonable care or controlling documentation - the two considerations dictating whether a duty exists (*see* <u>Wojciechowicz</u>, 576 F. Supp. 2d at 272) - is any support for the principle that an air traffic controller assumes a duty for terrain separation of a flight operating under VFR by giving an instruction. *See*  <u>In re: Air Crash Near Rio Grande, Puerto Rico</u>, 2016 WL 6916600, *7 (a VFR pilot "is responsible to avoid terrain . . . . To satisfy this requirement, the pilot must, at all times, fly in visual meteorological conditions . . . even if given a vector or other instructions by the controller"); <u>Crossman v. United States</u>, 378 F. Supp. 1312, 1316-17 (D. Or. 1974) ("[e]specially a VFR pilot has no right to rely on the mere notification of 'radar contact' as an invisible hand to  guide him thereafter").  Telling, Mr. Sommer's opinion is even contradicted by plaintiffs' other expert.

Mr. Sommer relies heavily on Section 2.2 of Annex 11  to ICAO 4444, which sets forth the objectives of air traffic control services to provide advice and information useful for the safe and efficient conduct of flights.  Sommer deposition transcript [155-25], p. 39.  However, as

discussed above, that opinion is expressly contradicted by ICAO 4444 which, states that "[t]he objectives of the air traffic control service as prescribed in Annex 11 *do not include prevention of collision with terrain*". [155-39], p. 106 of 223, § 5.9, Note 3 (emphasis added).

      Mr. Sommer's opinion also lacks common law support.  While it is recognized that when controlling a VFR flight "[t]he duty to issue a terrain alert  arises if a controller is *aware* that an aircraft is in *unsafe* proximity to terrain", In re: Air Crash Near Rio Grande, Puerto Rico, 2016 WL 6916600, *8 (emphasis in original)), there is no evidence in the record that Mr. Smith, who lacked any terrain warning equipment and did not have a visual on the aircraft, was aware that TKU662 was in an unsafe proximity to terrain. *See* id. (finding that no duty existed where the air traffic controller's "radar scope did not depict terrain contours or topographic features . . . or elevations" and did "not provide information about an aircraft's altitude above terrain").  Mr. Sommer acknowledged that Mr. Bulos had the responsibility to request a different instruction if he believed that there was any danger or other issue with instruction. Sommer deposition transcript [155-25], p. 69.  Since Mr. Bulos did not request an amended instruction or give any indication that he was unable to maintain his VFR responsibilities, Mr. Smith had no reason to believe that TKU662 was in unsafe proximity to terrain, or that Mr. Bulos could not maintain terrain separation. *See*  In re: Air Crash Near Rio Grande, Puerto Rico, 2016 WL 6916600, *8.

      Mr. Sommer's expert report [155-24] suggests that the dark conditions gave rise to a greater reliance by Mr. Bulos on the instructions of Mr. Smith.  Id., p. 6 of 28.  That may be so, but this did not give rise to any duty by Midwest ATC for terrain separation.  Significantly, Mr. Sommer conceded that the flight was under VFR throughout (Sommer deposition transcript [155-25], p. 93) - a designation selected by Mr. Bulos.  Midwest ATC's Statement of Material

Facts [155-2], ¶55. "[A]n air traffic controller is entitled to assume that if a pilot is flying under

VFR the . . . conditions the pilot is experiencing are above VFR minima". Wojciechowicz, 576

F. Supp. 2d at 275.

Therefore, I conclude, as a matter of law, that Midwest ATC owed no duty of care

to TKU662 for terrain separation.

### 2.    If a Duty of Care Existed, was Mr. Bulos the Sole Proximate Cause of the Accident?

Midwest ATC argues that even if it had some duty for terrain separation and was

negligent, plaintiffs' claims would still fail, since "it could never have been reasonably foreseen

that a VFR pilot, who is legally obligated to see and avoid terrain, would fail to circumnavigate

an obstacle or terrain".  Midwest ATC's Memorandum of Law [155-3], pp. 40-41.

New York courts have held that "[a] plaintiff's intervening conduct . . . can break

the chain of causal connection between a defendant's breach of duty and an ensuing injury to a

plaintiff so as to relieve a defendant from liability for negligence. Moreover, where a party

merely furnishes the occasion for an accident but does not cause it, liability may not be

imposed." M.B. ex rel. Scott v. CSX Transportation, Inc., 130 F. Supp. 3d 654, 676 (N.D.N.Y.

2015).  "New York courts have not been reluctant to grant summary judgment where the record

reflected that one party's negligence was the sole proximate cause of an accident." Gray v.

Wackenhut Services, Inc., 446 Fed. App'x 352, 354 (2d Cir. 2011) (Summary Order).

Even if Mr. Smith was negligent in directing Mr. Bulos toward the mountain or

out of Class D airspace, the fact remains that he had no reason to believe, from what was being

conveyed to him by Mr. Bulos and what he was able to observe on radar, that TKU662 was in

unsafe proximity to the terrain.  While Mr. Sommer also criticized Mr. Smith's failure to advise

Mr. Bulos to maintain VFR, he conceded that the flight was "always VFR".  Sommer deposition

transcript [155-25], p. 93.   Under those circumstances, "'[t]he controller had a right to assume

that in the absence of evidence to the contrary . . . . that the pilots could see the terrain

themselves.  'It is not negligence not to repeat information already given or that is already known

to the pilot.'" Biles, 848 F.2d at 663 n. 1 (5th Cir. 1988) (*quoting* Redhead, 686 F.2d at 183).

As a pilot flying under VFR, Mr. Bulos "had a continuing duty to be aware of his location, of the

elevation of the terrain over which he was flying, and of the danger posed by such terrain. He

was negligent in not fulfilling these duties, and that negligence was the proximate and sole cause

of this tragic plane crash". McDaniel, 553 F. Supp. at 916.


## CONCLUSION

For these reasons, I recommend that Midwest ATC's motion for summary

judgment [155] be granted.  Unless otherwise ordered by Judge Arcara, any objections to this

Report and Recommendation must be filed with the clerk of this court by May 2, 2017.  Any

requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to

object timely. . . waives any right to further judicial review of [this] decision". Wesolek v.

Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments,

case law and/or evidentiary material which could have been, but were not, presented to the

magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal

Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

DATED:  April 18, 2017

<u>/s/ Jeremiah J. McCarthy</u>
JEREMIAH J. MCCARTHY
United States Magistrate Judge